## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Lauren Barone, Eugenia Rukhin, Stephanie Bianco, and Stephanie Bianco on behalf of her minor child H.B., individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>    v.<br><br>TEMPUS AI, INC., ASTRAZENECA PLC, ASTRAZENECA AB, ASTRAZENECA PHARMACEUTICALS LP, and ASTRAZENECA LP,<br><br>          Defendants. | Case No.: 26-cv-03516<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION .................................................................................. 2

II.    JURISDICTION AND VENUE ............................................................................. 8

III.   PARTIES ............................................................................................................... 9

IV.   FACTUAL BACKGROUND ............................................................................... 17

      A.   Genetic Information Is Highly Valuable and Sensitive ....................................... 17

      B.   Because of its Value and Sensitivity, Illinois Law Specifically Protects Genetic Information ...................................................................................................... 18

      C.   Ambry Genetics Collects Personally Identifying Genetic Information from Plaintiffs and Class Members .................................................................. 21

      D.   Tempus AI Targeted Ambry Because its Business Model Depends on Amassing Genetic Information ................................................................... 24

           1.   How Artificial Intelligence Platforms Are Developed and Improved ...... 26

           2.   Tempus AI Needs Massive Health Data Sets to Develop, Enhance, and Market its AI Products ................................................................... 28

           3.   Tempus AI's Business Model Depends on Collecting and Disclosing Genetic Health Information ...................................................... 28

           4.   AstraZeneca Also Needs Health And Genetic Information and Aids and Abets Tempus AI's GIPA Violations to Obtain It .................................. 31

           5.   Tempus AI's Foundation Models and Other Large Genetic Datasets Are Not Anonymized or De-Identified ....................................... 39

      E.   Tempus AI Targets Ambry Genetics as a One-Stop Shop for Troves of Genetic Information ................................................................................... 43

      F.   Industry Standards Call for Data Transfer Consent in Acquisition Deals ............ 45

      G.   Tempus AI and Ambry's Public Claims to Only Disclose De-Identified Genetic Information are False .................................................................. 46

           1.   *Relatedly, GIPA's Safe Harbor Provisions for De-Identified Information and "Limited Data Sets" Cannot Apply* ............................... 48

V.    CLASS ALLEGATIONS ...................................................................................... 51

VI.   CAUSES OF ACTION ......................................................................................... 57

**FIRST CAUSE OF ACTION VIOLATION OF THE ILLINOIS GENETIC INFORMATION PRIVACY ACT ("GIPA") 410 ILCS 513/1, *et seq.* (On behalf of Plaintiffs, the Nationwide Class, and the Illinois Subclass against Tempus AI)...** 57

**SECOND CAUSE OF ACTION VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT ("CMIA") Cal. Civil Code §§ 56, *et. seq.* (On behalf of Plaintiffs, the Nationwide Class, and the California Subclass against Tempus AI)** ........................................ 60

**THIRD CAUSE OF ACTION VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL") Cal. Bus. & Prof. Code, §§ 17200, *et seq*. (On behalf of Plaintiffs, the Nationwide Class, and the California Subclass against Tempus AI)** ....................................................... 61

**FOURTH CAUSE OF ACTION VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW § 349 (On behalf of Plaintiff Bianco, Plaintiff Bianco on Behalf of H.B., and the New York Subclass against Tempus AI)** ........................................... 62

**FIFTH CAUSE OF ACTION UNJUST ENRICHMENT (On behalf of Plaintiffs and the Nationwide Class against Tempus AI)** ................................................ 65

**SIXTH CAUSE OF ACTION FRAUDULENT CONCEALMENT (On behalf of Plaintiffs and the Nationwide Class against Tempus AI)** ........................................... 67

**SEVENTH CAUSE OF ACTION ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT 815 Ill. Comp. Stat. §§ 510/2, *et seq.* (On behalf of Plaintiff Barone and the Illinois Subclass against Tempus AI)** .................................................. 67

**EIGHTH CAUSE OF ACTION ILLINOIS PERSONAL INFORMATION PROTECTION ACT 815 Ill. Comp. Stat. §§ 530/10(A), *et seq*. (On behalf of Plaintiff Barone and the Illinois Subclass against Tempus AI)** .................................. 70

**NINTH CAUSE OF ACTION AIDING AND ABETTING VIOLATIONS OF GIPA and the CMIA (On behalf of Plaintiffs and the Nationwide Class, against AstraZeneca)** ................................................................................................ 71

**VII. PRAYER FOR RELIEF** ................................................................................... 75

**VIII. JURY TRIAL DEMANDED** .......................................................................... 77

Plaintiffs Lauren Barone ("Plaintiff Barone"), Eugenia Rukhin ("Plaintiff Rukhin"), Stephanie Bianco ("Plaintiff Bianco"), and Stephanie Bianco on behalf of her minor child H.B. ("Plaintiff H.B."), individually, and on behalf of all other persons similarly situated (the "Classes"), by and through their undersigned attorneys, bring this class action against Defendants Tempus AI, Inc. ("Tempus AI"), AstraZeneca PLC, AstraZeneca AB, AstraZeneca Pharmaceuticals LP, and AstraZeneca LP (collectively with AstraZeneca PLC, AstraZeneca AB, and AstraZeneca Pharmaceuticals LP, "AstraZeneca") (collectively, "Defendants") and allege, upon personal information and belief and the investigation of their counsel, including consultation with experts, that Tempus AI compelled Ambry Genetics Corporation ("Ambry Genetics" or "Ambry") to disclose, as a condition of an acquisition agreement, valuable, highly sensitive genetic information Ambry collected from patients. Tempus AI caused the transfer and disclosure of this personally identifying, highly sensitive medical and genetic information for its own commercial benefit, without providing Ambry patients with notice of the disclosure, the opportunity to opt out or consent, or compensation for the value of their data. Worse, Tempus AI subsequently disclosed this genetic information to additional entities, including Defendant AstraZeneca, which knowingly aided and abetted Tempus AI's continuing violations of applicable privacy laws for their own commercial gain. For these reasons, and the reasons stated herein, Plaintiffs assert claims for damages and other legal and equitable remedies for common law violations and violations of the Illinois Genetic Information Privacy Act ("GIPA"), 410 ILCS 513/1, *et seq.*, the California Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code §§ 56.101 *et seq.*, and various state consumer and data protection statutes.

1

## I. NATURE OF THE ACTION[1]

1. Genetic information is among the most sensitive types of personal information because it makes us who we are. Specifically, genetic information is a type of protected health information that provides significant insights into an individual's health including, cancer risk, likelihood of developing reproductive health issues, predisposition to serious diseases, and likelihood of passing genetic conditions to children.[2,3]

2. Because genetic data is incredibly personal and revealing, federal and state regulations protect genetic information and treat it with some of the greatest protections to prevent unauthorized disclosure and misuse.

3. For example, Illinois codified the Genetic Information Privacy Act ("GIPA"), which provides that "genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized, in writing . . . by that individual to receive the information." 410 ILCS 513/15(a). GIPA further mandates that persons or entities may not disclose or compel disclosure of "the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that" identifies the subject of the test without legal authorization. *Id.* 513/30(a).

4. Despite these explicit protections, Tempus AI has built its artificial intelligence business on the collection and use of millions of patient records containing individuals' highly

---

[1] Unless otherwise stated, all emphasis herein is added.

[2] *See, e.g., Does the HIPAA Privacy Rule protect genetic information?*, U.S. DEP'T OF HEALTH & HUM. SERVS. (Dec. 20, 2002), https://www.hhs.gov/hipaa/for-professionals/faq/354/does-hipaa-protect-genetic-information/index.html ("Yes, genetic information is health information[.]").

[3] Lisa Bastarache et al., *Characterizing trends in clinical genetic testing: A single-center analysis of EHR data from 1.8 million patients over two decades*, 112(5) AM. J. OF HUM. GENETICS 1029-38 (Apr. 17, 2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC12120179/; *see also Genetic testing moving into the mainstream, UTSW study finds*, UT SW. MED. CTR. (Dec. 17, 2024), https://www.utsouthwestern.edu/newsroom/articles/year-2024/dec-genetic-testing-mainstream.html#:~:text=Using%20data%20from%20the%202022,and%20personal%20trait%20(6%25) ("81% of Americans are aware of genetic testing and 40% have undergone at least one test").

sensitive genetic information[4] so that it could develop, train, and improve its artificial intelligence ("AI") models. As a first-mover in health AI, Tempus AI's competitive advantage depends on its ability to amass enormous quantities of data, like Ambry patient data, containing genetic information to train and improve its AI platforms.

5. This is because, according to experts, AI models require an enormous amount of data for training, development, and improvement. In order to amass the genetic data Tempus AI needed for such development and to get ahead of its competitors, the company sought to move quickly and purchase the data from genetic testing companies, rather than obtain data legally from consenting individuals.

6. This led to Tempus AI's February 3, 2025 acquisition of Ambry Genetics for ***$600 million*** ($375 million in cash and $225 million in shares at closing); with Tempus AI touting in part that "the acquisition of Ambry will complement Tempus' strategy of using data to advance clinical and scientific innovation."[5] Founded in 1999, Ambry operates a clinical genetic testing laboratory that provides diagnostic products for heritable diseases in the areas of oncology, cardiology, neurology, and general genetics,[6] including hereditary cancer testing panels and rare

---

[4] *Tempus Introduces Fuses, A Program Designed to Transform Therapeutic Research and Build the Largest Diagnostic Platform Using its Novel Foundation Model*, Tempus AI (May 3, 2025), https://www.tempus.com/news/tempus-introduces-fuses-a-program-designed-to-transform-therapeutic-research-and-build-the-largest-diagnostic-platform-using-its-novel-foundation-model/?srsltid=AfmBOooVJcbwcY7FCsG5rQWa2CewZYXVXUNVXEWosB-oNanveSCZMI0L.
("Over the past decade, Tempus has built a multimodal data library of over 40 million research records, including ***more than 1.5 million records with matched clinical data linked with genomic information***[.]")
[5] Press Release, *Tempus Reports Third Quarter 2024 Results and Agreement to Acquire Ambry Genetics*, TEMPUS AI (Nov. 4, 2024), https://www.tempus.com/news/pr/tempus-reports-third-quarter-2024-results-and-agreement-to-acquire-ambry-genetics/; *see also* Edited Transcript, Q3 2024 Tempus AI, Inc. Earnings Call, REFINITIV STREET EVENTS (Nov. 4, 2024) (Chief Financial Officer ("CFO") Jim Rogers stating: "We have a large data business that we can kind of incorporate Ambry into."); *Tempus Completes Acquisition of Ambry Genetics*, TEMPUS AI (Feb. 3, 2025), https://www.tempus.com/news/acquisition-of-ambry-genetics/?srsltid=AfmBOoohzBTgooNEmfkWEFnPCbb7YESVktCzwI7MM52GnfK5j-ad1E1t;
*see generally, Ambry Genetics Providers*, AMBRY GENETICS, https://www.ambrygen.com/providers (last visited Mar. 24, 2026).
[6] *See generally, supra Ambry Genetics Providers*, AMBRY GENETICS.

disease testing—making Ambry an attractive acquisition target for Tempus AI. Tempus AI structured its acquisition of Ambry, as a stock sale through which Tempus AI acquired 100% of outstanding Ambry Genetics shares.[7] By purchasing those shares, Tempus AI became Ambry's new parent company and the new owner of Ambry's assets, specifically, including Ambry's repository of patients' private health and genetic information. The information Tempus AI acquired from Ambry included genetic testing results and the medical records attached to them containing, *inter alia*, names and health histories (referred to herein as "Private Information," which encompasses genetic information, personally identifiable information ("PII"), and private health information generally ("PHI")).[8]

7. At all relevant times, both Ambry and Tempus AI failed to provide proper notice to patients that their Private Information would be disclosed to Tempus AI or used by Tempus AI for its own profit. Worse, because Tempus AI failed to provide notice, patients (Plaintiffs and the Classes) did not: (i) have the opportunity to learn of the disclosures Tempus AI compelled in connection with Ambry's acquisition, (ii) take steps to opt out from the unauthorized disclosure of their most sensitive health information, or (iii) take part in the profits generated by the commercial use of their genetic information, Private Information.

---

[7] *See* Tempus AI, Inc., Current Report (Form 8-K) at 1 (Nov. 5, 2024).

[8] *Id.* § 3.10(l) (indicating that "[t]he disclosure or transfer of Sensitive Data to Buyer [Tempus AI] in connection with the transactions contemplated by this Agreement" was expected to occur); § 1.1 (defining, and thus underscoring the significance to Tempus AI of acquiring "'Personal Data' [which] means any information or data that either (a) relates to an identified or identifiable natural person or that is reasonably capable of being used to identify, contact, or precisely locate a natural person, household, or a particular computing system or device, including a natural person's name, street address, telephone number, email address, financial account number, government-issued identifier, social security number or tax identification number, biometric identifier or biometric information, banking information relating to any natural person, or passport number, client or account identifier, or credit card number, or any Internet protocol address or any other unique identifier, device or machine identifier, photograph, or credentials for accessing any accounts; or (b) is defined as 'personally identifiable information,' 'personal information,' 'personal data,' or other similar terms, by any applicable Privacy Requirements.").

4

8.      Tempus AI's failure to provide notice is glaring given that Ambry *promised* patients that it "is committed to protecting your privacy,"[9] that it would   "[m]aintain the confidentiality of your protected health information,"[10] it is "committed to protecting the information you have entrusted to us"[11] and that it acknowledges "genetic test results are intensely personal."[12]

9.      Tempus AI gained an enormous financial benefit from its unauthorized acquisition of Ambry patients' Private Information.  In the weeks immediately following the completion of the acquisition, Tempus AI reported "signed data agreements with *over 70 customers*, spanning both large and mid-sized pharma, including AstraZeneca, GlaxoSmithKline, Bristol Myers Squibb, Pfizer, Novartis, Merck, Abbvie, Daiichi Sankyo, Eli Lilly, Boehringer Ingelheim, and biotechs including Incyte, Servier, Aspera Biomedicines, and Whitehawk [Therapeutics]."[13] Based on these new customer contracts, Tempus AI reported an estimated *$300 million in additional potential* future contractual opt-ins, on top of Tempus AI's existing *$1.1 billion business*.

10.      Notably, Tempus AI's post-acquisition increase in customer contracts included a *$200 million data licensing and modeling agreement with AstraZeneca and Pathos* to "build the

---

[9] *Policies and Notices: Privacy Notice*, AMBRY GENETICS (Sep. 10, 2024), https://www.ambrygen.com/legal/privacy-policy.

[10] *Policies and Notices: Notice of Privacy Practices*, AMBRY GENETICS (Mar. 19, 2025), https://www.ambrygen.com/legal/notice-of-privacy-practices.

[11] *Information Security Statement*, AMBRY GENETICS, https://www.ambrygen.com/legal/information-security-statement (last visited Mar. 25, 2026).

[12] Deepti Babu, *It's Complicated: Sharing Your Genetic Test Results (Original)*, AMBRY GENETICS (Mar. 10, 2016), https://blog.ambrygen.com/patient/post/131/it-s-complicated-sharing-your-genetic-test-results-original (Deepti Babu, MS, CGC was a genetic counselor with Ambry at the time of publication).

[13] Press Release, *Tempus Achieves Record Total Contract Value Exceeding $1.1 Billion*, Tempus AI (Jan. 11, 2026), https://www.tempus.com/news/tempus-achieves-record-total-contract-value-exceeding-1-1-billion/?srsltid=AfmBOooSs9hIh7brRzHyDbskDTI1CINkBkM_0PLPmGPzHxNY1UkXZBEz.

largest foundation model that's ever been built in oncology," providing access to "over **300 petabytes of data**, which includes rich molecular data connected to outcomes."[14]

11.     Before Tempus AI had this data licensing agreement in place, it had been working with AstraZeneca for years.  Since approximately 2021, AstraZeneca sought to gain access to Tempus AI's data and algorithms.  AstraZeneca's interest in health and genetic data and its partnership with Tempus AI only became stronger in the months leading up to Tempus AI's acquisition of Ambry.  On information and belief, between 2024 and 2025 AstraZeneca negotiated its third major agreement with Tempus AI and invested massive sums of money in Tempus AI's infrastructure in order to gain access to both the Private Information Tempus AI had amassed from Ambry and others for its data models, and also the algorithms analysis of that Private Information.  These analytics insights would benefit all AstraZeneca divisions globally, including in the U.S.[15]

12.     Tempus AI has also entered into multi-year data agreements totaling hundreds of millions of dollars with GlaxoSmithKline ($180 million minimum commitment), Recursion Pharmaceuticals ($160 million), and Boehringer Ingelheim, among others.[16]

---

[14] *Q1 2025 Overview*, TEMPUS AI, https://investors.tempus.com/static-files/4862cc66-8cdd-4877-99ab-1f09f4753d39#:~:text=Let's%20start%20with%20the%20biggest,for%20its%20impact%20on%20patients (last visited Mar. 25, 2026) ("[T]hey are also covering a significant amount of the compute costs necessary to train the model.  When complete, each party gets a copy of the model - AZ and Pathos to advance their drug discovery efforts and Tempus to advance our diagnostic and data products.").

[15] *See Podcast: Integrating or Isolating? AstraZeneca's CDO on the Future of AI Governance*, CDO Magazine (Nov. 13, 2025), https://podscan.fm/podcasts/cdo-magazine-podcast-series/episodes/podcast-integrating-or-isolating-astrazenecas-cdo-on-the-future-of-ai-governance#:~:text=And%20so%20we've%20we,from%20the%20enterprise%20data%20office (in which U.S.-based Brian Dummann, VP of Insights & Technology and Chief Data Officer at AstraZeneca notes that company-wide "it's been very clear that AI is a tool for innovation and we need to take advantage of it"); *Precision medicine*, AstraZeneca, https://www.astrazeneca.com/r-d/precision-medicine.html (noting, on the page discussing its "precision medicine" and "genomics" research that "[t]his website is intended for people seeking information on AstraZeneca's **worldwide** business") (last visited Mar. 27, 2026).

[16] *See* Press Release, *Tempus Achieves Record Total Contract Value Exceeding $1.1 Billion*, TEMPUS AI (Jan. 11, 2026), https://www.tempus.com/news/tempus-achieves-record-total-contract-value-exceeding-1-1-billion/?srsltid=AfmBOoqrUrraZ2Ffu6YQyoffhJNv2kXqrMTcUc8B6MSY-y5HosQcIOCa;  Tempus AI, Inc., Annual Report (Form 10-K) (Feb. 24, 2025) at 37, 122.

13. Because Tempus AI deceptively and unfairly caused the unauthorized disclosure of Ambry patients' genetic health information—without obtaining any consent, let alone written consent—Tempus AI violated Illinois' GIPA statute and further violated common law and consumer protection statutes.

14. Because Tempus AI caused the unauthorized disclosure of private patient health information to itself and third parties like defendant AstraZeneca, it is also liable for violations of the CMIA.

15. Worse, Tempus AI *continues* to violate Ambry patients' privacy and engage in unfair and deceptive practices by selling third parties, like Recursion Pharmaceuticals, access to patients' Private Information and unique insights derived from their health information. Tempus AI illegally collects and discloses such information for its own financial benefit without compensating Plaintiffs and members of the Classes for the commercial value of their genetic data.

16. AstraZeneca aided and abetted Tempus AI by making an enormous financial investment in Tempus AI's foundation model infrastructure, covering "a significant amount of the compute costs necessary to train the[ir] model" that ingests genetic data to learn and improve.[17] This went above and beyond the mere purchase of a license and provided enormous financial incentive for Tempus AI to continue acquiring, retaining, and further disclosing Ambry patients' Private Information without proper authorization. Moreover, AstraZeneca knew the genetic data feeding these models was identifiable. AstraZeneca's own executive stated that the collaboration with Tempus AI would allow AstraZeneca to "[i]dentify[] patients and contextualize[] where they are in the care journey"—an acknowledgment that the data could be linked back to specific individuals.[18]

---

[17] *Q1 2025 Overview*, Tempus AI, Q1 2025 Overview.
[18] *Next Pathways*, TEMPUS AI, https://www.tempus.com/about-us/tempus-tech/ (last visited Mar. 25, 2026).

17.     For these reasons, Plaintiffs bring this action to recover damages, injunctive relief, and any other available remedies to redress Tempus AI's and AstraZeneca's unauthorized collection, disclosure, and use of their private, highly sensitive genetic information, including Private Information.

## II.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (1) this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (2) the proposed Classes contain more than 100 members; (3) minimal diversity exists because at least one proposed Class member is a citizen of a state different from Tempus AI's state of citizenship; and (4) no exceptions under § 1332(d) apply.

19.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.  Moreover, Plaintiff Barone is a citizen of the county in which this Court sits.

20.     This Court has personal jurisdiction over Tempus AI because Tempus AI is headquartered in Chicago, Illinois, conducts substantial business within this District, and has therefore established sufficient minimum contacts with the State of Illinois.

21.     This Court has personal jurisdiction over AstraZeneca pursuant to 735 ILCS 5/2-209.  Specifically, AstraZeneca is subject to the jurisdiction of this Court by transacting business within Illinois and by making and performing contracts substantially connected to Illinois, including the data licensing and collaboration agreement with Tempus AI, an Illinois-headquartered company.  Additionally, AstraZeneca purposefully directed activities towards

Illinois residents and have established sufficient minimum contacts within this State, such that exercise of jurisdiction comports with traditional notions of fair play and justice.[19]

22. Venue is proper in this District under 28 U.S.C. § 1391(b) because Tempus AI maintains its corporate headquarters in this District, Tempus AI conducts substantial business in this District, Plaintiff Lauren Barone resides in this District, AstraZeneca conducts business in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## III. PARTIES

### PLAINTIFFS

23. **Plaintiff Lauren Barone** is, and has at all relevant times been, a resident and a citizen of Chicago, Cook County, Illinois. Plaintiff Barone became an Ambry Genetics patient in the Fall of 2023 when she underwent genetic testing at the direction of her doctor.

24. As a patient receiving medical services, Plaintiff Barone reasonably expected that her personally identifiable information including her highly sensitive medical and genetic information would remain private. Plaintiff Barone also reasonably expected that her personally identifiable information including her private medical and genetic information would be protected in accordance with applicable laws, such as the Health Insurance Portability and Accountability

---

[19] AstraZeneca in the U.S., AstraZeneca, https://careers.astrazeneca.com/united-states (last visited Mar. 27, 2026) (Noting that "[t]he **United States is our largest market**, representing a significant proportion of our global business and playing a pivotal role in achieving AstraZeneca's long-term ambitions" and featuring a "Clinical Research Associate" job opening based in Chicago, Illinois); *Precision medicine*, AstraZeneca, https://www.astrazeneca.com/r-d/precision-medicine.html (noting, on the page discussing its "precision medicine" and "genomics" research that "[t]his website is intended for people seeking information on AstraZeneca's **worldwide** business"); *Annual Report and Form 20-F Information 2025*, AstraZeneca at 29, https://www.astrazeneca.com/content/dam/az/Investor_Relations/annual-report-2025/pdf/AstraZeneca_AR_2025.pdf#page=29 (noting in the company-wide 2025 Annual Report that "AstraZeneca" "[e]stablished strategic AI collaborations with Tempus and Pathos to develop the largest multimodal oncology foundation model").

Act ("HIPAA"),[20] GIPA, and the CMIA, and further in accordance with Ambry Genetics' representations that her information would be kept private.

25.     Unbeknownst to Plaintiff Barone, aided and abetted by AstraZeneca, Tempus AI compelled Ambry Genetics' disclosure of its repository of identifiable medical and genetic information available to Tempus AI, which, to the best of her knowledge and belief, included Plaintiff Barone's personally identifying information and identifiable genetic testing results.

26.     Plaintiff Barone does not recall ever receiving notice regarding the possibility of her genetic information being shared with third parties, nor does she recall ever receiving notice of the disclosure of her highly sensitive genetic information from Ambry to Tempus AI.  To that end, Plaintiff Barone received no opportunity to contest or opt out of the disclosure of her Private Information to Tempus AI in connection with the 2025 acquisition ("Genetic Data Disclosure") or to others thereafter.

27.     Thus, Plaintiff Barone did not consent to (i) the transfer of her identifiable Private Information to Tempus AI, (ii) the transfer of her identifiable private genetic information to any other third party, or (iii) the use of her (supposedly de-identified) Private Information in applications related to the development of AI.

28.     As a direct and proximate result of the Defendants' wrongdoings, Plaintiff Barone suffered a loss of her privacy, property interest in her Private Information, and emotional distress, among others.

29.     Plaintiff Barone faces a continuing injury because Defendants continue to use her allegedly de-identified data in its AI models.  Plaintiff Barone faces the ongoing risk that

---

[20] HIPAA is cited as Public Law 104-191, 110 Stat. 1936, which was enacted August 21, 1996.  However, the primary regulations are codified in the Code of Federal Regulations ("CFR") at 45 C.F.R. §§ 160, 162, and 164.

Defendants or third parties may reidentify her allegedly de-identified data. Tempus AI deprived her of any opportunity to consent to or contest the use of her data, de-identified or otherwise, or to seek compensation for such use.

30. **Plaintiff Eugenia Rukhin** is, and has at all relevant times been, a resident and a citizen of Los Angeles County, California. Plaintiff Rukhin became an Ambry Genetics patient in or around February 2024 when she underwent genetic testing ordered by her doctor in connection with certain health concerns.

31. As a patient receiving medical services, Plaintiff Rukhin reasonably expected that her personally identifiable information including her highly sensitive medical and genetic information would remain private. Plaintiff Rukhin also reasonably expected that her personally identifiable information including her private medical and genetic information would be protected in accordance with applicable laws, such as the HIPAA, GIPA, and the CMIA, and further in accordance with Ambry Genetics' representations that her information would be kept private.

32. Unbeknownst to Plaintiff Rukhin, aided and abetted by AstraZeneca, Tempus AI compelled Ambry Genetics' disclosure of its repository of identifiable medical and genetic information available to Tempus AI, which, to the best of her knowledge and belief, included Plaintiff Rukhin's personally identifying information and identifiable genetic testing results.

33. Plaintiff Rukhin does not recall ever receiving notice regarding the possibility of her genetic information being shared with third parties, nor does she recall ever receiving notice of the disclosure of her highly sensitive genetic information from Ambry to Tempus AI. To that end, Plaintiff Rukhin received no opportunity to contest or opt out of the Genetic Data Disclosure.

34. Thus, Plaintiff Rukhin did not consent to (i) the transfer of her identifiable private genetic information to Tempus AI, (ii) the transfer of her identifiable private genetic information

to any other third party, or (iii) the use of her (supposedly de-identified) private genetic information in applications related to the development of AI.

35. As a direct and proximate result of Defendants' wrongdoings, Plaintiff Rukhin suffered a loss of her privacy, property interest in her Private Information, and emotional distress, among others.

36. Plaintiff Rukhin faces a continuing injury because Defendants continue to use her allegedly de-identified data in its AI models. Plaintiff Rukhin faces the ongoing risk that Defendants or other parties may reidentify her allegedly de-identified data. Tempus AI deprived her of any opportunity to consent to or contest the use of her data, de-identified or otherwise, or to seek compensation for such use.

37. **Plaintiff Stephanie Bianco and her minor child, Plaintiff H.B**., are, and have been at all relevant times, residents and a citizens of Suffolk, New York. Plaintiff Bianco and Plaintiff H.B. became Ambry Genetics patients in November of 2023 when, at the direction of her doctor, Plaintiff Bianco underwent genetic testing in connection with her pregnancy while Plaintiff H.B. was in utero. As part of Plaintiff Bianco's genetic test, genetic information was taken by Ambry from Plaintiff H.B. in utero.

38. As a patient receiving prenatal medical services, Plaintiff Bianco reasonably expected that her and Plaintiff H.B.'s Private Information, including their highly sensitive medical and genetic information, would remain confidential. Plaintiff Bianco also reasonably expected that her such data and that of Plaintiff H.B. including their private medical and genetic information would be protected in accordance with applicable laws, such as HIPPA, GIPA, and the CMIA, and further in accordance with Ambry Genetics' representations that their information would be kept private.

39.     Unbeknownst to Plaintiff Bianco, aided and abetted by AstraZeneca, Tempus AI compelled Ambry Genetics' disclosure of its repository of identifiable medical and genetic information available to Tempus AI, which, to the best of her knowledge and belief, included Plaintiff Bianco's and Plaintiff H.B.'s personally identifying information and identifiable genetic testing results.

40.     Plaintiff Bianco does not recall ever receiving notice regarding the possibility of her, or Plaintiff H.B.'s genetic information being shared with third parties, nor does she recall ever receiving notice of the disclosure of her or Plaintiff H.B.'s highly sensitive genetic information from Ambry to Tempus AI.  To that end, Plaintiff Barone and Plaintiff H.B. received no opportunity to contest or opt out of the Genetic Data Disclosure.

41.     Thus, neither did Plaintiff Bianco nor her minor child consent to (i) the transfer of her or Plaintiff H.B.'s identifiable private genetic information to Tempus AI, (ii) the transfer of her or Plaintiff H.B.'s identifiable private genetic information to any other third party, or (iii) the use of her or Plaintiff H.B.'s (supposedly de-identified) private genetic information in applications related to the development of AI.

42.     As a direct and proximate result of the Defendants' wrongdoings, Plaintiff Bianco and Plaintiff H.B. suffered a loss of their privacy, property interest in their Private Information, and emotional distress, among others.

43.     Plaintiff Bianco and Plaintiff H.B. face a continuing injury because, upon information and belief, Defendants continue to use their allegedly de-identified data in its AI models.  Plaintiff Bianco and Plaintiff H.B. face the ongoing risk that Defendants or third parties may reidentify their allegedly de-identified data.  Tempus AI deprived Plaintiff Bianco and

13

Plaintiff H.B. of any opportunity to consent to or contest the use of their data, de-identified or otherwise, or to seek compensation for such use.

**DEFENDANTS**

44.     **Defendant Tempus AI** is a healthcare technology company founded in 2015 and incorporated in the state of Nevada with its principal place of business at 600 West Chicago Avenue, Suite 510, Chicago, Illinois 60654.[21]  Tempus AI maintains office and lab locations across the country but makes its business decisions at its headquarters in Chicago, Illinois.[22]  Tempus AI also operates a laboratory in Chicago, Illinois, where it conducts genomic and DNA sequencing.

45.     Tempus AI dominates the field of genetic testing and analysis, namely because it has designed the leading artificial intelligence software for clinical research. Its mission is to "build innovative tech solutions oriented around clinical care and research products"[23] and "bring[] data and AI to healthcare."[24] Tempus AI offers numerous AI-driven technologies to healthcare providers[25] and is known as "a leading company at the forefront of the precision medicine revolution . . . unlocking the power of patient data"[26] and "a [r]ising [s]tar in AI-[d]riven [d]iagnostics" with "one of the world's largest libraries of clinical and molecular data."[27]

46.     Through the company's AI-enabled platform, Tempus AI analyzes general molecular data alongside actual clinical data from providers to inform its clients (physicians, health

---

[21]Tempus AI, Inc., Current Report (Form 8-K) (Jan. 12, 2026).

[22] *Our Locations*, TEMPUS AI, https://www.tempus.com/contact-us/ (last visited Mar. 25, 2026) (showing "Chicago—Tempus Headquarters and Lab").

[23] *Investor Relations*, TEMPUS AI,  https://investors.tempus.com/ (last visited Mar. 26, 2026).

[24] *Bringing data and AI to healthcare*, TEMPUS AI, https://www.tempus.com/about-us/tempus-tech/ (last visited Mar. 25, 2026).

[25] *Id.*

[26] *Transforming Healthcare with Tempus AI: A Comprehensive Overview*, Hyscaler (June 6, 2024), https://hyscaler.com/insights/tempus-ai-powered-precision-medicine/.

[27] *AI in Healthcare and Medical Robotics: Investment Opportunities*, KAVOUT, https://www.kavout.com/market-lens/ai-in-healthcare-and-medical-robotics-investment-opportunities (last visited Mar. 25, 2026).

systems) and creates clinical test reports that are customizable for those clients' individual patients seeking care in the areas of oncology, cardiology, neurology, radiology, and/or pathology.[28] Tempus AI amasses enormous sets of genetic data to train its algorithms.

47. **Defendant AstraZeneca PLC** is a UK-based multinational holding company and the ultimate parent company of all AstraZeneca Defendants "AstraZeneca was founded in 1999 through the merger of Sweden's Astra AB and the UK's Zeneca Group PLC."[29]. AstraZeneca PLC is a foreign company with its principal executive office at 1 Francis Crick Avenue, Cambridge, CB2 0AA, England; and its principal place of business in the United States is located at 35 Gatehouse Drive, Waltham, MA 02451. At all relevant times, AstraZeneca PLC conducted business in the United States, for example, through its many subsidiary offices in the United States, and through its subsidiary's contract with Illinois-headquartered Tempus AI. AstraZeneca PLC may be served with process via Registered, Return Receipt Requested, International Mail to its principal place of business pursuant to Articles 10(a) and 15 of the Hague Convention on the Service of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

48. **Defendant AstraZeneca AB** is a wholly-owned Swedish subsidiary of AstraZeneca PLC with its principal place of business at SE-151 85, Sodertalje, Sweden. At all relevant times, AstraZeneca AB conducted business in the United States, for example through its contract with Illinois-headquartered Tempus AI. AstraZeneca AB may be served with process via Registered, Return Receipt Requested, International Mail to its principal place of business

---

[28] *Blog—Advancing the frontier of AI in healthcare*, TEMPUS AI (Oct. 9, 2025), https://www.tempus.com/resources/content/articles/advancing-the-frontier-of-ai-in-healthcare/?srsltid=AfmBOoriG2ci0ieNElWyE9bSRVQOsFzms_h0pdNPolTtmmJne1XKzSIk.

[29] *Our History*, AstraZeneca, https://www.astrazeneca.com/our-company/history.html (last visited Mar. 29, 2026).

pursuant to Articles 10(a) and 15 of the Hague Convention on the Service of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

49. **Defendant AstraZeneca Pharmaceuticals LP** is a limited partnership wholly-owned by AstraZeneca PLC,[30] incorporated and existing under the laws of the State of Delaware, with its United States headquarters located at 1800 Concord Pike, Wilmington, DE 19850.

50. **Defendant AstraZeneca LP** likewise is a limited partnership wholly-owned by AstraZeneca PLC,[31] organized and existing under the laws of the State of Delaware, with its United States headquarters located at 1800 Concord Pike, Wilmington, DE 19850.

51. AstraZeneca not only conducts business in the State of Illinois, but also has a large presence in the United States generally, maintaining primary offices in Boston, Gaithersburg, and Wilmington, with additional sites in Frederick, MD, Waltham, MA, Coppell, TX, Newark, DE, New York, NY, Durham, NC, Redwood City, CA, San Francisco, CA, Mount Vernon, IN, Shepherdsville, KY, and Philadelphia, PA. Astrzeneca also hires employees based in Chicago, IL.

52. AstraZeneca, through AstraZeneca AB, entered into a data licensing and modeling agreement with Tempus AI worth $200 million, pursuant to which, on information and belief, AstraZeneca PLC and its global subsidiaries obtained access to Tempus AI's genetic data sets, including data derived from Ambry Genetics patients. Through this agreement, AstraZeneca received disclosures of genetic information belonging to Plaintiffs and members of the proposed Classes without their knowledge or written authorization.

---

[30] Astrazeneca PLC, Annual Report of foreign private issuers (Form 20-F), Exhibit 8.1 (Group Subsidiaries) (Feb. 24, 2026).
[31] *Id*.

## IV.  FACTUAL BACKGROUND

### A.  Genetic Information Is Highly Valuable and Sensitive

53.  Genetic Information refers to the portions of DNA that comprise the basic physical and functional units of heredity.  "Every person has two copies of each gene, one inherited from each parent."  Each person, even an "identical" twin, carries slight differences in their genes that make up their unique features.[32]

54.  Because of these unique variations, DNA and genes contain an immense amount of valuable information concerning an individual's unique health and family history including the likelihood of being diagnosed with hereditary conditions or passing on conditions to children.

55.  This valuable genetic data is generally obtained and analyzed through genetic screening, a process used to assess an individual's risk of disease and genetic makeup.

56.  Patients make the intimate health decision to undergo genetic testing to glean information like whether genetic conditions run in their family, whether they may have children with genetic conditions, or to learn about their likelihood of being diagnosed with cancer.  This information is highly personal and sensitive.

57.  A genetic screening process typically involves (i) extracting DNA from an individual's blood, saliva, or tissue, (ii) analyzing the sample through molecular biology assessments, like DNA sequencing, and (iii) assessing the patient's health risks or predispositions.

---

[32] *See Identical twins are not so identical, study suggests*, THE GUARDIAN (Jan. 7, 2021), https://www.theguardian.com/science/2021/jan/08/identical-twins-are-not-so-identical-study-suggests (suggesting that not even identical twins are 100% genetically identical); *Genetic Alliance; The New York-Mid-Atlantic Consortium for Genetic and Newborn Screening Services, Understanding Genetics: A New York, Mid-Atlantic Guide for Patients and Health Professionals. Washington (DC)*, *Appendix A, Basic Genetics Information*, GENETIC ALLIANCE (July 8, 2009), https://www.ncbi.nlm.nih.gov/books/NBK115558/.

58.     According to the National Institutes of Health, "[g]enetic screening occupies an increasingly important position in modern medicine and personal health management."[33]  Genetic screening has gained prominence, in large part, because of an individual's ability to learn critical information about their unique genetic makeup, family health history and impact, and likelihood of passing genetic conditions before making reproductive health decisions.[34]

59.     In addition to arming patients with key information about their health, genetic testing information is highly valuable to pharmaceutical companies and research institutes (*e.g.* those run by the government or universities) for scientific research purposes.  "The large amount of data generated by genetic screening provides valuable resources for scientific research.  By analyzing this data, researchers can gain in-depth understanding of the genetic basis of diseases, discover new disease markers and therapeutic targets, and promote medical progress and innovation."[35]

**B.      Because of its Value and Sensitivity, Illinois Law Specifically Protects Genetic Information**

60.     Illinois enacted GIPA in 2008, recognizing the importance and sensitivity of genetic information.  Specifically, the Illinois General Assembly found that (paraphrased):

(1)     Genetic testing can offer meaningful and valuable benefits to individuals and patients.

(2)     Despite laws, regulations, and professional guidelines that support voluntary participation and confidentiality, many individuals are reluctant to pursue

---

[33] Chung-Lin Lee et al., *Understanding Genetic Screening: Harnessing Health Information to Prevent Disease Risks*, INT'L J. MED. SCI. 22(4):903-919 (Jan. 21, 2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC11843151/.

[34] *Id.*

[35] *Id.*

genetic testing due to concerns that their results could be improperly shared without consent or used in a discriminatory way.

(3)     Promoting the voluntary, confidential, and non-discriminatory use of genetic information contributes positively to public health.

(4)     The adoption of electronic health records and the secure sharing of patient information—whether in paper or digital form—should be supported, including through secure health information exchanges, to enhance patient care, improve coordination, aid public health reporting, and reduce healthcare expenses.

(5)     A fundamental principle of protecting health information privacy is ensuring that the use, disclosure, and requests for protected health information are limited to what is strictly necessary to achieve a specific purpose. Under GIPA, any permitted disclosure of genetic information must comply with HIPAA's minimum necessary requirement.

410 ILCS 513/5.

61.     GIPA defines "genetic testing" as "an analysis of human DNA, RNA, chromosomes, proteins, or metabolites, if the analysis detects genotypes, mutations, or chromosomal changes."  410 ILCS 513/10 (referring to 45 C.F.R. § 160.103)[36].  GIPA defines "genetic information" as "(i) [t]he individual's genetic tests; (ii) [t]he genetic tests of family members of the individual; (iii) [t]he manifestation of a disease or disorder in family members of such individual; or (iv) [a]ny request for, or receipt of, genetic services, or participation in clinical research which includes genetic services, by the individual or any family member of the individual." *Id.*

---

[36] GIPA incorporates several terms and concepts from the Privacy Rule under HIPPA.

62.     GIPA provides that "genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized, in writing in accordance with Section 30, by that individual to receive the information."  410 ILCS 513/15(a).

63.     GIPA prohibits any person from disclosing or compelling disclosure of "the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the" test subject, except to the test subject, any person designated in a specific written legally effective release executed by the test subject, or the subject's legally authorized representative, and certain other individuals.  410 ILCS 513/30 ("Section 30").

64.     GIPA also prohibits any person to whom test results have been disclosed from disclosing the results to another person except as the statute authorizes.  410 ILCS 513/35 ("Section 35").

65.     Any covered entity "using or disclosing genetic-related information under" GIPA must "do so in accordance with the minimum necessary standard under HIPAA."  410 ILCS 513/31.10.  Under HIPAA, "[t]he minimum necessary standard requires covered entities to evaluate their practices and enhance safeguards as needed to limit unnecessary or inappropriate access to and disclosure of protected health information."[37]

66.     GIPA provides "[a]ny person aggrieved by a violation of this Act . . . a right of action" for statutory damages ranging from $2,500 to $15,000 per violation, reasonable attorneys' fees and costs, and injunctive and other relief.  410 ILCS 513/40.

---

[37] *Minimum Necessary Requirement*, U.S. DEP'T OF HEALTH & HUMAN SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/minimum-necessary-requirement/index.html (last visited Mar. 25, 2026).

67.     As alleged further herein, Tempus AI violated 410 ILCS 513/15(a), 410 ILCS 513/30(a), and 410 ILCS 513/35 of GIPA by unlawfully compelling Ambry Genetics to disclose identifiable genetic information belonging to thousands of United States residents' for Tempus AI's commercial gain (*i.e.*, to develop its medical research algorithms), and thereafter transmitting such genetic information to third parties absent informed written consent of Ambry patients.

68.     As further alleged herein, AstraZeneca aided and abetted Tempus AI's violation of GIPA through its AI partnership with Tempus AI to gain access to valuable genetic data assets it could not otherwise obtain, using massive financial investments to acquire access to proprietary data sets containing sensitive patient health information.

## C.     Ambry Genetics Collects Personally Identifying Genetic Information from Plaintiffs and Class Members

69.     With operations spanning globally, Ambry Genetics has established itself as an industry leader in consumer genomics and health history services. Through its clinical genetic testing laboratory offers diagnostic products directed at a range of hereditary disease research areas.[38]

70.     Ambry Genetics' extensive product offerings include hereditary cancer testing panels and rare disease testing. Additionally, Ambry Genetics promotes its collection of "Real World Data from over 2.5 million genetic tests" and operates AmbryShare, launched in 2016 as the largest structured collection of genetic information publicly available for download, containing "aggregated allele frequency data" encompassing "all 20,000+ genes in the human genome[.]"[39]

---

[38] *Our Story*, AMBRY GENETICS, https://www.ambrygen.com/company/our-story (last visited Mar. 25, 2026).

[39] Press Release, *Ambry Genetics' Big Data Sharing Program Now Available for Public Download*, AMBRY GENETICS (Jan. 16, 2017), https://www.ambrygen.com/company/press-release/84/ambry-genetics-big-data-sharing-program-now-available-for-public-download; *Real World Data*, AMBRY GENETICS, https://www.ambrygen.com/partners/pharma-services/real-world-data-services (last visited Mar. 25, 2026).

71.     Despite what Tempus AI claims, and as further explained below, even aggregated information remains inherently identifiable, even if supposedly de-identified.  There is growing evidence that in such genomic data sets, "the specific identity of the individual who was the source of the data could [] be determined if that source were known through other means or reference data," such as the data that Ambry, and now Tempus AI, would have on file.[40]  As a result, organizations like the National Institutes of Health have "move[d certain] aggregate genotype data to [] controlled-access database[s], where there is a firewall as well as protections and policies in place for appropriate data access, including review and approval of data access requests."[41]

72.     Ambry Genetics amasses its massive genetic data sets through its genetic testing services.  Specifically, patients consult with their doctor or healthcare provider who then orders a genetic test, resulting in the patient's submission of blood or saliva samples to Ambry.  Ambry Genetics then analyzes a person's genome and determines whether the patient has inherited genes predisposing them to cancer, cardiac trouble, rare diseases, or other maladies.[42]

---

[40] Elias A. Zerhouni and Elizabeth G. Nabel, *Protecting Aggregate Genomic Data*, SCIENCE (Oct. 3, 2008), https://doi.org/10.1126/science.1165490.

[41] *Id.* (urging that "the protection of participant privacy and the confidentiality of their data are of paramount importance . . . NIH urges the scientific community to consider carefully how these data are shared and take appropriate precautions to secure aggregate [genome-wide association study] data in order to protect participant privacy and data confidentiality"); *see also* Sean Simmons and Bonnie Berger, *One Size Doesn't Fit All: Measuring Individual Privacy in Aggregate Genomic Data*, Proceedings: 2015 IEEE CS Security and Privacy Workshops 41-49 (2015) (concluding that "perturbing [genetic] data [sets] appears to provide major gains in privacy, [but] these gains come at the cost of utility" and "truncating minor allele frequencies *may* result in privacy guarantees without the loss of too much utility" but even such a measure "will not protect against an [entity] that has access to insider information" that can be used to cross-reference against the database, like Tempus AI or a threat actor), https://ieeexplore.ieee.org/stampPDF/getPDF.jsp?arnumber=7163207.

[42] *About Hereditary Cancer*, AMBRY GENETICS, https://www.ambrygen.com/patients/cancer (last visited Mar. 25, 2026); *Hereditary Heart Conditions*, AMBRY GENETICS, https://www.ambrygen.com/patients/cardiology (last visited Mar. 25, 2026); *Hereditary Neurological Conditions*, AMBRY GENETICS, https://www.ambrygen.com/patients/neurology (last visited Mar. 25, 2026); *Rare and Undiagnosed Conditions*, AMBRY GENETICS, https://www.ambrygen.com/patients/exome-and-general-genetics (last visited Mar. 25, 2026).

73.     Ambry performs these medical testing services for patients subject to Ambry's assurances that patients' medical information will remain protected in accordance with applicable law and kept private and secure.

74.     Ambry promises that it "is committed to protecting your privacy"[43] and acknowledges that it is "required by law to: Maintain the confidentiality of your protected health information in accordance with [HIPAA]."[44]  Ambry's Notice of Privacy Practices also assures patients that "[u]nless otherwise permitted by applicable law, we will not use or disclose your PHI for purposes not described in this Notice unless you give us written authorization to do so." Patients who engage Ambry's services and read its policies are thereby assured that Ambry is "committed to protecting the information you have entrusted to us." [45]  Moreover, Ambry's staff has assured its patients that Ambry understood "genetic test results are intensely personal."[46] (Tempus AI's founder has similarly admitted: "Healthcare data singularly belongs—the ownership of that data—is with the patient and no one can ever take that away." [47])

75.     In recent years, Ambry has doubled down on these privacy assurances, particularly in the wake of a data breach of Ambry patient information in 2020.  After the data breach, Ambry—which tellingly was able to identify the individuals whose data was breached—reached a settlement under which Ambry contractually agreed take "enhanced security measures that it will

---

[43] *Policies and Notices: Privacy Notice*, AMBRY GENETICS (Sep. 10, 2024), https://www.ambrygen.com/legal/privacy-policy.
[44] *Policies and Notices: Notice of Privacy Practices*, AMBRY GENETICS (Mar. 19, 2025), https://www.ambrygen.com/legal/notice-of-privacy-practices.
[45] *Information Security Statement*, AMBRY GENETICS, https://www.ambrygen.com/legal/information-security-statement (last visited Mar. 25, 2026).
[46] Deepti Babu, *It's Complicated: Sharing Your Genetic Test Results (Original)*, AMBRY GENETICS (Mar. 10, 2016), https://blog.ambrygen.com/patient/post/131/it-s-complicated-sharing-your-genetic-test-results-original (Deepti Babu, MS, CGC was a genetic counselor with Ambry at the time of publication).
[47] Halle Tecco, Micheal Esquivel, Steve Kraus, Precision Medicine is (Almost) Here | Tempus AI CEO Eric Lefkosky, The Heart of Healthcare | A Digital Health Podcast (Spotify [Feb. 23, 2026]) at 17:32 https://open.spotify.com/episode/6OY1QvtGPGUb9EbhveYFsc?si=2adbef9089574c4f&nd=1&dlsi=e7eefd5b8fa74a6a.

continue to implement."[48]  These measures included "enhancing policies, procedures, and training to staff on how to appropriately manage PHI; continuing annual security-awareness training and individual training to certain employees and individuals handling PHI; enhancing restrictions in the company to access to PHI, and continuing to require that Ambry's Chief Compliance Officer or the Chief Compliance Officer's delegate(s) approve employee access to PHI by employee type and/or by employee . . . retaining vendors that ensure Ambry meets all *SOC* 2-certification requirements,"[49] and more.  Such statements convey to the reasonable person that Ambry took patients' privacy seriously.

#### D.    Tempus AI Targeted Ambry Because its Business Model Depends on Amassing Genetic Information

76.    Tempus AI is one of the country's leading health technology companies.  It was founded in 2015 to develop artificial intelligence software for cancer research and care.

77.    Tempus AI develops "innovative tech solutions oriented around clinical care and research products" with a mission to "[b]ring[] data and AI to healthcare."[50]  The company provides healthcare providers with a suite of AI-driven technologies with names like "Hub," "One," "Now," "Lens," "Pixel," etc.[51]  These technologies improve as the scale of the data at Tempus AI's disposal increases because the data serves as the foundation for training Tempus' AI algorithms.  Indeed, more data enhances the performance of Tempus AI's models and, by

---

[48] *Notice of Ambry Genetics Data Breach Class Action Settlement*, AMBRYBREACHSETTLEMENT.COM, https://www.ambrybreachsettlement.com/ (last visited Mar. 25, 2026).
[49] ORDER GRANTING PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, *In Re: Ambry Genetics Data Breach Litigation*, No. 8:20-cv-00791, ECF No. 145 (C.D. Cal. Oct. 5, 2022).
[50] *Bringing data and AI to healthcare*, TEMPUS AI, https://www.tempus.com/about-us/tempus-tech/ (last visited Mar. 25, 2026).
[51] *Id.*

extension, elevates the company's appeal to its paying clients: healthcare providers and pharmaceutical partners.

78.     Through their AI-enabled platform, Tempus AI can analyze general molecular data alongside actual clinical data from providers to help inform its clients (physicians, health systems) and create clinical test reports that are customizable for those clients' individual patients. "We have replicated this model beyond oncology, moving into disease areas and specialty areas such as cardiology, neurology, radiology, and pathology."[52]

79.     Through its "Insights" product, Tempus AI licenses libraries of linked, allegedly de-identified clinical, molecular, and imaging data to pharmaceutical and biotechnology companies for use across the entire drug lifecycle, from discovery and research through development, clinical trials, and commercialization. Tempus AI provides not only the data itself but also a suite of analytic and cloud-computing tools, including their proprietary "Lens" application that allows researchers to identify, license, and analyze patient cohorts using sophisticated filtering and computational capabilities. Tempus AI's development of artificial intelligence for health sciences is extremely lucrative. The "AI in diagnostics" industry is growing so rapidly that some have projected it will grow "from USD 10.12 billion in 2026 to USD 209.63 billion by 2034, exhibiting a CAGR of 46.06%."[53]

---

[52] *Blog—Advancing the frontier of AI in healthcare*, TEMPUS AI (Oct. 9, 2025), https://www.tempus.com/resources/content/articles/advancing-the-frontier-of-ai-in-healthcare/?srsltid=AfmBOoriG2ci0ieNElWyE9bSRVQOsFzms_h0pdNPolTtmmJne1XKzSIk.

[53] *AI in Diagnostics Market Size, Share & Industry Analysis, By Component (Solutions/Software and Services), By Technology (Machine Learning, Natural Language Processing (NLP), and Others), By Specialty (Oncology, Neurology, Pathology, and Others), By End-user (Hospitals & Clinics, Diagnostics & Imaging Centers, and Others), and Regional Forecasts, 2026-2034*, FORTUNE BUSINESS INSIGHTS (Mar. 9, 2026), https://www.fortunebusinessinsights.com/ai-in-medical-diagnostics-market-111351.

### 1.    How Artificial Intelligence Platforms Are Developed and Improved

80.    Artificial intelligence, or "AI," refers to "the capability of computer systems or algorithms to imitate intelligent human behavior."[54]

81.    These algorithms are mathematical procedures or rule sets that are designed to analyze data, discern patterns, and reach related conclusions.[55]  An "algorithm is simply a strand of coded instructions for completing a task or solving a problem," but when used to power AI, algorithm webs are far more complex, drawing conclusions based on billions of data points and, on an automated basis, incorporating each conclusion into the next analysis—thus, building "knowledge."[56]

82.    Machine learning models require an enormous amount of data in order to build this "knowledge."[57]

83.    Machine learning, a sub-field of AI, refers to processes whereby an algorithm is provided data and something to predict, and the algorithm generates a predictive model.  Data is used to train the AI algorithms through a repetitive "trial and error" process, thus exposing the algorithms to various data points for training.  The size and complexity of many machine learning generated models is vast.  It is generally understood that: (1) the more data a machine learning system has access to, the more powerful it will be, and (2) it is not productive to make guesses ahead of time regarding which data will improve the predictive power of a machine learning

---

[54]    *Artificial Intelligence*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/artificial%20intelligence (last visited Mar. 25, 2026).

[55] *Algorithm*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/algorithm (last visited Mar. 25, 2026).

[56] *How do Algorithms Work?*, UNIV. OF YORK, https://online.york.ac.uk/how-do-algorithms-work/#:~:text=An%20algorithm%20is%20a%20coded,to%20produce%20the%20desired%20result (last visited Mar. 25, 2026).

[57] *See* Danilo Bzdok et al., *Machine learning: a primer*. 14 NAT METHODS 1119–1120 (2017), https://doi.org/10.1038/nmeth.4526; Cecilia Kang et al., *Four Takeaways on the Race to Amass Data for A.I.*, N.Y. TIMES (Apr. 6, 2024), https://www.nytimes.com/2024/04/06/technology/ai-data-tech-takeaways.html ("A.I. models become more accurate and more humanlike with more data").

system. As a result, those designing or utilizing machine learning systems generally do not pre-determine which data is useful, and instead provide the system with as much data as possible.

84. A highly complex type of machine learning system is called a "neural network." A neural network essentially takes input data and applies various weighted averages—or other similar transformations—to that data. Each weighted average is called a "node." The machine learning system is trained by iteratively adjusting the weighting—and other factors affecting each node—to produce a model that accurately makes a prediction. A sophisticated operational neural network can have many of these "hidden" layers. The graphics below show simple diagrams representing a multi-layered neural network.





85. The models used within neural networks are far more complex than a simple formula that weighs inputs at a simple singular rate. As a result, once the input data in a neural

network is passed from layer to layer in the synthesized form of various weighted averages (each weighting the data from the prior layer differently), the significance of any given unit of input data to the predictive accuracy of the model cannot be readily isolated. As a result, these neural network machine learning systems are often referred to as "black box" systems because it is not generally possible to look inside the system to see how exactly it functions in any sort of intuitive way, although it is possible to know that the network does function to produce outputs based on the inputs and that each input is processed by the system. Because the relationships cannot be known, it is widely thought to be necessary to provide the system with as much data as possible.

### 2. Tempus AI Needs Massive Health Data Sets to Develop, Enhance, and Market its AI Products

86. Because artificial intelligence models such as those at the core of Tempus AI's business rely on massive data sets, Tempus AI needs to collect massive amounts of health data. Without access to enormous amounts of health data, Tempus AI could not develop or improve its artificial intelligence product offerings or compete in the health AI industry.

87. In other words, the more data is made available to Tempus AI's algorithms, the better its AI-based commercial products will become, and the more money it will make for its shareholders.

### 3. Tempus AI's Business Model Depends on Collecting and Disclosing Genetic Health Information

88. As explained above, Tempus AI depends on the collection of massive amounts of genetic health data to train and improve its algorithms. These algorithms form the basis of its health technology product offerings.

89. Tempus AI's business model relies on its capacity to "license libraries of linked clinical, molecular, and imaging de-identified data," including genetic information like Ambry's,

28

"and provide a suite of analytic and cloud-and-compute tools to pharmaceutical and biotechnology companies."[58] Tempus AI's data services include clinical trial matching and analysis.[59]

90.     Tempus AI's data licensing business centers on monetizing the vast purportedly de-identified multimodal healthcare datasets the company generates through its diagnostic testing operations and direct data connections with healthcare providers.  As explained above, through its "Insights" product, Tempus licenses libraries of linked, allegedly de-identified clinical, molecular, and imaging data to pharmaceutical and biotechnology companies for use across the entire drug lifecycle, from discovery and research through development, clinical trials, and commercialization. Tempus AI provides both the data itself and a suite of analytic and cloud-computing tools, including their proprietary "Lens" application that allows researchers to identify, license, and analyze patient cohorts using sophisticated filtering and computational capabilities. Customers either pay on a per-file basis or through multi-year data licensing agreements.  This business model is particularly valuable because the allegedly de-identified data records have "lifetime value" that increases over time as they are longitudinally updated with clinical outcomes and treatment response data.  As of December 31, 2025, Tempus AI had signed data contracts with over $1.1 billion in remaining total contract value, and the business demonstrated strong expansion with "Net Revenue Retention" of approximately 126% year-over-year, reflecting existing customers significantly increasing their data licensing purchases.

91.     As Tempus itself admits, it needs data to stay on top: "In the world of AI, foundation models are transforming industries. Most of today's foundation models are trained on the entire internet, learning from a vast but often unstructured and noisy sea of information. But when it comes to healthcare, the stakes are higher, the data is often siloed and not easily accessible, and

---

[58]  Tempus AI, Inc., Registration Statement (Form S-1) (May 20, 2024).
[59]  *See id.*

the need for accuracy is paramount."[60] Tempus AI itself explains: "[r]ecent research from NYU shows that models trained exclusively on healthcare data are outperforming general-purpose models like ChatGPT on clinical tasks."[61] Moreover, Tempus AI's "[p]latform connects multiple stakeholders within the larger healthcare ecosystem, often in near real time."[62]

92.     In 2025 alone, "Tempus signed data agreements with over 70 customers, spanning both large and mid-sized pharma, including AstraZeneca, GlaxoSmithKline, Bristol Myers Squibb, Pfizer, Novartis, Merck, Abbvie, Daiichi Sankyo, Eli Lilly, Boehringer Ingelheim, and biotechs including Incyte, Servier, Aspera Biomedicines, and Whitehawk Therapeutics, as an increasing number of biopharma companies are incorporating Tempus' unique, multimodal dataset into their drug discovery and development efforts."[63]

93.     Notably, on April 23, 2025, Tempus AI announced it had entered into a "3 year, $200 million data licensing and modeling agreement with AstraZeneca and Pathos . . . to build the largest foundation model that's ever been built in oncology." Pursuant to this agreement, Tempus AI granted AstraZeneca and Pathos access to "over 300 petabytes of data, which includes rich molecular data connected to outcomes."[64] Because the agreement was "non-exclusive," Tempus AI retained the ability "to license its data and build other models with other biopharma companies," which it indicated it "expect[ed] to do in the future."[65]

---

[60]*Blog—Advancing the frontier of AI in healthcare,* TEMPUS AI, https://www.tempus.com/resources/content/articles/advancing-the-frontier-of-ai-in-healthcare/ (last visited Mar. 25, 2026).

[61] *Id.*

[62] Tempus AI, Inc., Annual Report (Form 10-K) (Feb. 24, 2025).

[63] Press Release, *Tempus Achieves Record Total Contract Value Exceeding $1.1 Billion*, TEMPUS AI (Jan. 11, 2026), https://www.tempus.com/news/tempus-achieves-record-total-contract-value-exceeding-1-1-billion/?srsltid=AfmBOooo0U8HZJ7Hc1fHAmRG7JhLqD6ok-3TRPMBdR-WN7YO8VHaMZ5H.

[64] *Tempus Q1 2025 Overview*, TEMPUS AI, https://investors.tempus.com/static-files/4862cc66-8cdd-4877-99ab-1f09f4753d39 (last visited Mar. 25, 2026).

[65] *Id.*

### 4. AstraZeneca Also Needs Health And Genetic Information and Aids and Abets Tempus AI's GIPA Violations to Obtain It

94. As described herein, Tempus AI engaged in willful conduct that caused injury to Plaintiffs and the Classes, and, at all relevant times, AstraZeneca assisted Tempus in its efforts. AstraZeneca was not only regularly aware of their role as part of Tempus AI's overall tortious activity at the time that they provided this assistance, but they knowingly and substantially assisted Tempus AI's violation.

95. AstraZeneca, a pharmaceutical giant,[66] has openly acknowledged that it is not an AI company, but that it *must* partner with other AI companies to access their data capabilities.[67] To that end, AstraZeneca has invested billions of dollars in AI partnerships to gain access to data assets it could not otherwise obtain, including collaborations with CSPC Pharmaceutical (up to $5.3 billion), Verge Genomics (more than $880 million), Absci ($247 million), and Algen Biotechnologies (up to $555 million).[68] AstraZeneca's partnership with Tempus AI fits squarely within this strategy of using massive financial investments to acquire access to proprietary data sets containing sensitive patient health information.

96. AstraZeneca's relationship with Tempus AI began in November 2021, when the two companies entered into a multi-year strategic collaboration.[69] From the outset, AstraZeneca

---

[66] *See, e.g.* Luke Halpern and Laura Silvius, *Breaking News: AstraZeneca, White House Announce Most-Favored-Nation Deal*, PHARMACY TIMES (Oct. 10, 2025), https://www.pharmacytimes.com/view/breaking-news-astrazeneca-white-house-set-to-agree-to-most-favored-nation-deal (referring to AstraZeneca as a "pharmaceutical giant" in a report about the company's "investing $50 billion in manufacturing and research and development in the US.").

[67] *See* Tristan Manalac, *AstraZeneca Makes Another AI Deal With $555M Algen Alliance, BioSpace* (Oct. 6, 2025), https://www.biospace.com/business/astrazeneca-makes-another-ai-deal-with-555m-algen-alliance.

[68] *Id.*

[69] Press Release, Tempus, *Tempus Signs Strategic Collaboration Agreement with AstraZeneca to Advance Oncology Therapeutics* (Nov. 19, 2021), https://www.tempus.com/news/pr/tempus-signs-strategic-collaboration-agreement-with-astrazeneca-to-advance-oncology-therapeutics/?srsltid=AfmBOortTyOox2GY85U6yQBPLE0yBmV-dpxj2tRe7aNI8pqaiGst118W.

31

was drawn to Tempus AI because of its access to data assets. AstraZeneca described Tempus AI as having "one of the world's largest libraries of clinical and molecular data," and AstraZeneca sought to leverage Tempus AI's allegedly "de-identified data and analytical tools across a broad range of capabilities."[70]

97. AstraZeneca's then-Executive Vice President of Oncology R&D, Susan Galbraith, stated that the collaboration would allow AstraZeneca to "enhance [its] data-driven R&D strategy and glean critical insights" by analyzing "vast amounts of rich data using artificial intelligence."[71] This initial collaboration established AstraZeneca as Tempus AI's "longest standing data customer" and demonstrated AstraZeneca's deep familiarity with and reliance upon Tempus AI's data practices.[72]

98. By 2024, the relationship between AstraZeneca and Tempus AI had deepened significantly. So much so that AstraZeneca's Chief Medical Officer and Oncology Chief Development Officer, Cristian Massacesi, appeared alongside Tempus AI's Executive Vice President of Life Sciences Strategy & RWD, Iker Huerga, at a prominent industry conference to discuss their collaboration.[73] During this discussion, Massacesi emphasized the importance of "genomics and the integration of multi-omic data sets" to understand cancer biology. Massacesi stated that "AI and multimodal data are invaluable across the drug development journey" and that AstraZeneca's partnership with Tempus AI had yielded "successes with real-world evidence data and organoid work, which wouldn't have been possible without this collaboration."[74] This public

---

[70] *Id.*

[71] *Id.*

[72] Tempus AI, Inc., Q1 2025 Overview, at 7 (2025).

[73] Q&A: Embracing AI in Oncology: A Fireside Chat with Industry Leaders at AACR 2024, Tempus (May 24, 2024), https://www.tempus.com/resources/content/articles/embracing-ai-in-oncology-a-fireside-chat-with-industry-leaders-at-aacr-2024/.

[74] *Id.*; *see also* Mahadik, Shreyash et al. "Harnessing digital health technologies and real-world evidence to enhance clinical research and patient outcomes." Digital health vol. 11 20552076251362097. 23 Jul. 2025,

endorsement is just one example demonstrating AstraZeneca's intimate knowledge of how Tempus AI was collecting, integrating, and monetizing highly sensitive patient data—including genetic data or PHI —for commercial purposes.

99. In June 2024, prior to Tempus AI's acquisition of Amrby, the AstraZeneca and Tempus AI announced yet another expansion of their partnership. This time, the expanded agreement would leverage Tempus's AI-powered platform to support biomarker testing for non-small cell lung cancer patients.[75] The initiative built upon a pilot program that began in September 2023, which used Tempus's services "to identify this specific care gap at participating provider sites, using AI to scan unstructured clinical data to understand which patients may be eligible for testing based on clinical guidelines, and notifying treating physicians to inform care."[76]

100. This collaboration further demonstrates AstraZeneca's direct engagement with Tempus AI's data capabilities, since the program relied on Tempus's ability to analyze "a comprehensive suite of data—including clinical notes, molecular information, and imaging—to pinpoint certain deviations from care guidelines."[77]

101. In the years that followed, AstraZeneca continued to work closely with Tempus AI to fulfill its continuing need to amass and access health and genetic information to develop its own pharmaceutical products. As part of this close working relationship, AstraZeneca would seek

---

doi:10.1177/20552076251362097 (explaining that "real-world data" can include lab results); Yao, Qigu et al. "Organoids: development and applications in disease models, drug discovery, precision medicine, and regenerative medicine." MedComm vol. 5,10 e735. 21 Sep. 2024, doi:10.1002/mco2.735 (defining organoids as "miniature, highly accurate representations of [specific] organs that capture the[ir] structure and unique functions" and that "[o]rganoids encapsulate the genetic profiles . . . of organ-specific cells").

[75] *See* Press Release, Tempus, *Tempus Announces Expansion of Collaboration with AstraZeneca to Leverage Tempus Next to Support Guideline-directed Biomarker Testing in NSCLC* (June 1, 2024), https://www.tempus.com/news/tempus-announces-expansion-of-collaboration-with-astrazeneca-to-leverage-tempus-next-to-support-guideline-directed-biomarker-testing-in-nsclc/?srsltid=AfmBOor13kFh2Z05pGvJUaNS77FzlagKOKSKXuNHKUoWXTSRPBC2OX4S.

[76] *Id.*

[77] *Id.*

specific types of health and genetic information from Tempus AI and Tempus AI would take steps to fulfill those data requests.

102. This data-sharing relationship culminated with an April 2025 agreement between AstraZeneca and Tempus AI under which AstraZeneca made a significant financial investment in Tempus AI aimed at training the AI models AstraZeneca needed for its own business. This agreement was finalized just three months after Tempus AI's acquisition of Ambry and would necessarily have been being negotiated at the same time Tempus was working to acquire Ambry for its enormous genetic data sets. Thus, AstraZeneca's April 2025 agreement with Tempus AI was not a coincidence.

103. This agreement did not replace AstraZeneca's existing data license with Tempus AI; rather, it expanded AstraZeneca's access to Tempus AI's data.[78] Under the prior licensing arrangement, AstraZeneca received data "files they can bring into their environment and use for both discovery and regulatory purposes."[79] The 2025 agreement went further, granting AstraZeneca access to "over 300 petabytes of data," *including data from Ambry Genetics*, to build a foundation model that would yield "new biological and clinical insights to guide drug development."[80]

104. As alleged throughout this Complaint, Tempus AI violated GIPA by (i) compelling Ambry Genetics to disclose Plaintiffs' and members of the proposed Classes' genetic testing and information derived from genetic testing without written authorization, and (ii) then disclosing that genetic information to third parties, including AstraZeneca, without notice to Ambry's patients or their written authorization.

---

[78] Tempus AI, Inc., Q1 2025 Overview, at 4 (2025), *supra*.
[79] *Id.*
[80] *Id. at 3*; *see also* Manalac, *supra*.

105. AstraZeneca knowingly and substantially assisted Tempus AI's violations of GIPA by aiding and encouraging the means of systematic disclosure of Ambry patient data to Tempus AI's partners. AstraZeneca made a "significant investment" in Tempus AI's infrastructure, covering "a significant amount of the compute costs necessary to train the model."[81] This provided enormous financial incentive for Tempus AI to continue acquiring, retaining, and further disclosing Ambry patients' sensitive genetic information by any means necessary, even if it was obtained without patient knowledge, consent, or authorization.

106. AstraZeneca was aware of its role as part of the overall tortious activity at the time it provided assistance to Tempus AI. AstraZeneca is a sophisticated global pharmaceutical company that entered into what Tempus AI's CEO described as "probably the most important deal I have ever personally worked on."[82] AstraZeneca knew it was obtaining a massive trove of genetic and clinical information that could only have been amassed through acquisitions like the Ambry Genetics transaction. As a major pharmaceutical company subject to its own data privacy and regulatory obligations, AstraZeneca knew or should have known that genetic data of this magnitude and sensitivity required proper authorization from the individuals whose information was contained therein. AstraZeneca's deep financial and operational involvement in Tempus AI's data-dependent systems demonstrates that it was not merely a passive recipient of data or analytical services, but an active participant that was aware of Tempus AI's unauthorized collection of thousands of health and genetic information.

107. Not only was AstraZeneca aware of Tempus AI's failure to obtain consent before collecting and using the data, but it stood to profit from the joint scheme. Under the 2025 agreement, each party received a copy of the foundation model—"AZ and Pathos to advance their

---

[81] Tempus AI, Inc., Q1 2025 Overview, at 3 (2025), *supra*.
[82] *Id.* at 4.

drug discovery efforts and Tempus to advance [its] diagnostic and data products."[83] This arrangement demonstrated that, as of 2025, AstraZeneca was no longer merely licensing static data, but was actively collaborating with Tempus AI to build AI models trained on genetic information obtained without notice or consent. The non-exclusive nature of the agreement further incentivized Tempus AI's unlawful data practices, as Tempus AI remained "free to license its data and build other models with other biopharma companies," multiplying the commercial value of the improperly obtained genetic data.[84] AstraZeneca's demand for and willingness to pay for access to this genetic data, its capital investment in Tempus AI's efforts, and its active participation in building AI, directly aided and abetted Tempus AI's violations of GIPA and other laws.

108. Moreover, the timing of the 2025 deal between Tempus AI and AstraZeneca is telling. Tempus AI touted that the Ambry acquisition, which became final a mere two months before AstraZeneca's, was "synergistic" with its data business, noting that Ambry Genetics "generates vast amounts of data across the ~400k patients it sequences each year" and that Tempus AI would "leverage this data and augment its current data offering."[85] The acquisition expanded Tempus AI's "oncology dataset to include approximately 3 million genomic sequences from patients undergoing hereditary cancer testing."[86] AstraZeneca's massive investment provided Tempus AI with both the financial means and the commercial justification to acquire Ambry Genetics and incorporate its patients' genetic data into the very data sets AstraZeneca was licensing.

---

[83] *Id.* at 3.

[84] *Id.*

[85] Tempus, *43rd Annual J.P. Morgan Healthcare Conference* (Jan. 13, 2025), at 11, https://investors.tempus.com/static-files/80e049bc-5dac-4b68-b699-984cd28763f2.

[86] Ryan Fukushima, *Blog—Advancing the frontier of AI in healthcare*, Tempus AI (Oct. 9, 2025) https://www.tempus.com/resources/content/articles/advancing-the-frontier-of-ai-in-healthcare/?srsltid=AfmBOop8qMHBGNf3VwRCUcwHXiDbXcBLKZ3aqO3pMQoC8zsl5In82NBz.

109.    The timing and structure of these transactions demonstrate that AstraZeneca's investments were designed to fuel Tempus AI's aggressive data acquisition strategy.  Tempus AI openly acknowledged that its genomics business and data business are intertwined, with patient testing generating the data that Tempus AI then licenses to pharmaceutical companies like AstraZeneca.[87]  Tempus AI's Q1 2025 financial results showed that its Data and Services business grew 43.2% year-over-year, with its data licensing ("Insights") business growing 58.0%, "largely driven by" revenue from agreements like the AstraZeneca deal.[88]  The "Genomics" business— which now includes the Ambry Genetics hereditary testing operation—grew 88.9% year-over-year.[89]  This symbiotic relationship between genomic testing and data licensing means that every dollar AstraZeneca invested in Tempus AI's data business directly incentivized Tempus AI to acquire more genetic data through any means necessary—including the unauthorized acquisition of Ambry Genetics' patient data.

110.    AstraZeneca knew or should have known that the genetic data it was receiving from Tempus AI could not have been lawfully obtained without individual patient consent.  AstraZeneca is a sophisticated pharmaceutical company with extensive experience in clinical trials and data privacy regulations, including HIPAA and state genetic privacy laws.  AstraZeneca's own executives have publicly discussed the importance of "genomics" and "multi-omic data sets" in drug development, demonstrating their understanding that the data Tempus AI was providing included genetic information derived from patient testing.[90]  Tempus AI's claim that its data is "de-identified" does not absolve AstraZeneca of knowledge, as AstraZeneca's own executive stated

---

[87] Tempus AI, Inc., Q1 2025 Overview, at 1, 3-4 (2025), supra.
[88] *Id.* at 1, 3.
[89] *Id.* at 1.
[90] *Q&A: Embracing AI in Oncology: A Fireside Chat with Industry Leaders at AACR 2024*, Tempus AI (May 24, 2024), https://www.tempus.com/resources/content/articles/embracing-ai-in-oncology-a-fireside-chat-with-industry-leaders-at-aacr-2024/.

that the collaboration with Tempus AI would allow AstraZeneca to "[i]dentify[] patients and contextualize[] where they are in the care journey"—an acknowledgment that the data could be linked back to specific individuals.[91] AstraZeneca's willingness to invest hundreds of millions of dollars to access this data, combined with its deep familiarity with Tempus AI's data practices developed over years of collaboration, demonstrates that AstraZeneca was fully aware of how Tempus AI was acquiring and monetizing patient genetic information.

111. Beyond the collaboration with AstraZeneca, on May 14, 2025, Tempus AI announced a "[m]ulti-[y]ear [s]trategic [c]ollaboration with Boehringer Ingelheim" to "leverage[e] data and AI to further advance therapeutic research and development."[92] Under that agreement, "Boehringer will have access to Tempus' de-identified database containing molecular, clinical, and imaging data and its analytical platform, Lens."[93]

112. In addition, just five months later, on October 16, 2025, Tempus AI announced a "collaboration with Whitehawk Therapeutics" under which Whitehawk would gain access to Tempus' "multimodal database."[94]

113. By allowing third parties access to its database of sensitive, private genetic information, Tempus AI discloses genetic information in its possession to third parties. This information includes Plaintiffs' and members of the proposed Classes' sensitive genetic information that Tempus AI acquired from Ambry Genetics without written authorization.

---

[91] *Next Pathways*, TEMPUS AI, https://www.tempus.com/about-us/tempus-tech/ (last visited Mar. 25, 2026).
[92] Press Release, *Tempus Enters Multi-Year Strategic Collaboration with Boehringer Ingelheim to Advance its Cancer Pipeline*, TEMPUS AI (May 14, 2025), https://www.tempus.com/news/tempus-enters-multi-year-strategic-collaboration-with-boehringer-ingelheim-to-advance-its-cancer-pipeline.
[93] *Id.*
[94] Press Release, *Tempus Announces Collaboration with Whitehawk Therapeutics to Advance Biomarker-Driven Oncology Research*, TEMPUS AI (Oct. 16, 2025), https://www.tempus.com/news/pr/tempus-announces-collaboration-with-whitehawk-therapeutics-to-advance-biomarker-driven-oncology-research.

5. **Tempus AI's Foundation Models and Other Large Genetic Datasets Are Not Anonymized or De-Identified**

114. The genetic information that Tempus AI discloses to third parties is not anonymous or de-identified. To understand why this is the case, one needs to understand how these data sets, including foundation models, work in commercial applications.

115. "Foundation model," refers to a "large-scale machine learning model[] trained on broad and diverse datasets, enabling [it] to generalize across a wide range of downstream tasks."[95] These models "serve as the fundamental framework for a multitude of [artificial intelligence] tasks" because they can learn from large amounts of data and these lessons and the patterns that are identified can then be applied to many different types of tasks without needing much additional training.[96]

116. These capabilities extend to the healthcare field, which has increasingly employed the use of foundation models to glean patterns from genomic data, "enabling the identification of genetic markers for diseases and the prediction of treatment responses" thus "demonstrating significant potential in various applications ranging from disease diagnosis to drug discovery."[97] "In genomics, Foundation Models have been used to predict gene expression, understand genetic variations, and identify disease-associated genes."[98]

117. The data that goes into these models, even just within the healthcare context, is varied. Researchers and scientists can choose to input medical imaging results, clinical notes, miscellaneous medical records, or genomic data.[99] When "[s]tructured electronic health records

---

[95] Mahan Timilsina et al., *Harmonizing Foundation Models in Healthcare: A Comprehensive Survey*, COMPUTS IN BIOLOGY & MED. 189 (May 2025) at 3, https://www.sciencedirect.com/science/article/pii/S0010482525002768.
[96] *Id.*
[97] *Id.* at 6-7.
[98] *Id.* at 7.
[99] *Id.* at 1.

39

are primary sources of input for disease prediction, [they offer] rich and well-structured information that reflects patient disease progression and represents one of the most valuable resources for health data analysis."[100]  Some of these record types are easier to scrub, or de-identify, than others before feeding them to the machine learning model.  General medical records, for example, can be stripped of directly identifying information like patient dates of birth, names, or geographic location.  Genetic information, however, is different because it is *itself* inherently identifying biometric information.[101]  It can never truly be anonymized.

118.  For this reason, some experts have expressed significant privacy concerns regarding the use of genetic data in foundation models.[102]  Several studies [have] show[n] that AI techniques often do not maintain data privacy."[103]  For example, "attacks known as membership inference can be used to infer an individual's membership by querying over the dataset or the

---

[100] *Id.* at 9.

[101] *Policy Statement of the Federal Trade Commission on Biometric Information and Section 5 of the Federal Trade Commission Act*, FTC, https://www.ftc.gov/system/files/ftc_gov/pdf/p225402biometricpolicystatement.pdf (last visited Mar. 25, 2026) (listing "genetics" as a type of biometric information); *see also* Zhen Lin, Art B. Owen & Russ B. Altman, *Genomic Research and Human Subject Privacy*, 305 Science 183, 183 (2004), https://www.science.org/doi/10.1126/science.1095019 (suggesting that even in back 2004 it only took 30–80 statistically independent single nucleotide polymorphisms ("SNPs") in a sample, out of the hundreds of millions identified in human beings, to "uniquely identify a single person"); Tuuli Lappalainen et al., *Genomic Analysis in the Age of Human Genome Sequencing*, https://www.cell.com/action/showPdf?pii=S0092-8674%2819%2930215-6 ("There are 3–4 million SNV[ariants]s . . . in a typical comparison of one human versus the reference, and the dbSNP catalog (build 151) has over 660 million SNVs and indels from diverse sequencing studies")' *Inherently identifiable: Is it possible to anonymize health and genetic data*, IAPP (Nov. 13, 2019), https://iapp.org/news/a/inherently-identifiable-is-it-possible-to-anonymize-health-and-genetic-data ("With only a sequence of 30 DNA SNPs strands, a data subject can be identified. . . . Due to the highly distinguishable and stable nature of DNA, it should be considered inherently identifiable.").

[102] *See* Timilsina et al., *Harmonizing Foundation Models in Healthcare: A Comprehensive Survey*, Computers in Biology and Medicine 189 (2025) at 13, https://www.sciencedirect.com/science/article/pii/S0010482525002768 ("The integration of foundation models in healthcare contexts involving sensitive health information raises paramount data privacy and security concerns.").

[103] Reihaneh Torkzadehmahani et al., *Privacy-Preserving Artificial Intelligence Techniques in Biomedicine*, METHODS OF INFO. IN MED. (June 2022) at e13, https://www.thieme-connect.com/products/ejournals/pdf/10.1055/s-0041-1740630.pdf.

trained model," meaning that there are ways to draw inferences about the identities of the individuals whose genetic data is used within the model.[104] Moreover, researchers have demonstrated that an adversary "can use the statistics published as the result of genome-wide association studies (GWAS) to find out if an individual was a part of the study[,] . . . and the attacker could identify the relatives of those individuals and obtain sensitive disease information."[105]

119. While, theoretically, there are ways to preserve privacy, experts question whether any method can truly protect privacy in practice. Indeed, various privacy-preserving techniques have been developed with the goal of addressing these concerns, including cryptographic techniques, differential privacy, federated learning, and hybrid approaches.[106] Cryptographic techniques such as "homomorphic encryption" and "secure multiparty computation" ensure the secrecy of sensitive data by encrypting the biological data that is fed to the AI algorithm.[107] "Differential privacy" is a mathematical model that encapsulates the idea of injecting enough randomness or noise to sensitive data to camouflage the contribution of any single individual.[108] However, it is unclear whether these methods are actively being used and, according to experts, even if they are used, they may render the large, underlying genetic data sets meaningless or not useful.[109]

120. However, the one of the only approaches that can be used to disclose genetic data without risk of identification is to use synthetic data (*i.e.*, data manufactured for research or business purposes).[110]

---

[104] *Id.* at e12-e13.
[105] *Id.*
[106] *See id.* at e13.
[107] *Id.*
[108] *See id.* at e15.
[109] *See id.* at e17-e18.
[110] *See id.* at e17.

121. Based on the facts concerning Tempus' acquisition of Ambry, and upon information and believe, Tempus AI and Ambry failed to follow privacy best practices. Ambry Genetics failed to modify, process, and retain control over the genetic data records before making them available to Tempus AI.

122. Moreover, even if privacy-preserving measures were theoretically available or followed, the practical limitations of implementing such practices would have been apparent. As explained in the paragraphs above, implementation of certain privacy best practices comes with the risk that the data and resulting models are less accurate, meaning that Tempus AI's products may have suffered, risking its position as an industry leader. However, Tempus AI continues to lead the industry in developing health AI platforms and products and increased its licensing agreements and partnerships immensely in the wake of its acquisition of Ambry and its Private Information.

123. In truth, Tempus AI sought to monetize genetic data sets for its own benefit— developing AI models based on as much genetic data possible. Understanding that obtaining such large, highly valuable data sets would be incredibly expensive, Tempus AI sought to amass the data through the fastest and most inexpensive means possible: here, acquiring the data from Ambry. However, Tempus AI failed to obtain or even attempt to seek the consent of the patients whose Private Information it sought to acquire. Thus, Tempus prioritized its own profits over privacy and legal obligations, like those set forth by GIPA.

124. For all of these reasons, it is evident that Tempus AI's data sets are not anonymized: genetic data is inherently identifiable, Tempus AI's prior statements and Ambry's prior data breach notices reveal that they are able to link Private Information back to individual patients, there is *no evidence* that Ambry Genetics took steps to deidentify the data.

**E.      Tempus AI Targets Ambry Genetics as a One-Stop Shop for Troves of Genetic Information**

125.     On November 4, 2024, Tempus AI announced it would acquire Ambry Genetics for $375 million in cash and $225 million in shares.[111]  Discussing the deal, Tempus AI touted the vast genetic data set it would acquire.  For example, Tempus AI's CEO and Founder stated, "This acquisition complements our strategy of leveraging diagnostics and data to drive innovation, further strengthening our ability to deliver cutting-edge solutions to clinicians, patients, and life sciences companies."[112]  During the company's Q3 2024 Earnings Call, Tempus AI's CEO described the acquisition as "synergistic across all our products," including "our Data business and our AI Applications business."[113]  And during the same call, Tempus AI's CFO remarked, "[w]e have a large data business that we can kind of incorporate Ambry into."[114]

126.     On February 3, 2025, Tempus announced it had completed its acquisition of Ambry Genetics.[115]  In direct violation of GIPA, Tempus AI compelled Ambry Genetics to disclose highly sensitive genetic information provided by individuals to Ambry Genetics, including during due diligence for the acquisition, so that Tempus AI could use that data to train its AI algorithms.  This highly sensitive genetic information is now in Tempus AI's possession—all without ever informing Plaintiffs or members of the proposed Classes or *see*king written authorization.

---

[111] Press Release, *Tempus Reports Third Quarter 2024 Results and Agreement to Acquire Ambry Genetics*, TEMPUS AI (Nov. 4, 2024), https://investors.tempus.com/news-releases/news-release-details/tempus-reports-third-quarter-2024-results-and-agreement-acquire.

[112] Press Release, *Tempus Completes Acquisition of Ambry Genetics*, TEMPUS AI (Feb. 3, 2025), https://investors.tempus.com/news-releases/news-release-details/tempus-completes-acquisition-ambry-genetics.

[113] Edited Transcript, *Q3 2024 Tempus AI, Inc. Earnings Call*, REFINITIV STREETEVENTS (Nov. 4, 2024).

[114] *Id.*

[115] Press Release, *Tempus Completes Acquisition of Ambry Genetics*, TEMPUS AI (Feb. 3, 2025), https://www.tempus.com/news/acquisition-of-ambry-genetics/.

127. Tempus AI then incorporated Ambry Genetics' genetic information data into its own data set. For example, Tempus AI noted that "both legacy Ambry and the legacy Tempus sequencing business live within [Tempus AI's] Genomics offering."[116] Describing the acquisition, Ambry Genetics' CEO explained: "[w]e will be able to bring Ambry's 25-year history of leadership in variant interpretation together with Tempus's multimodal data and robust analytical systems to drive new insights for diagnosing and treating patients."[117] Tempus AI further assured its investors in February of 2025 that because "Ambry generates vast amounts of data across the ~400k patients it sequences each year," this would allow Tempus AI to "leverage this data to augment its current data offering."[118]

128. On October 9, 2025, Tempus AI announced that as a result of its acquisition of Ambry Genetics, it has "expanded [its] oncology dataset to include approximately 3 million genomic sequences from patients undergoing hereditary cancer testing."[119]This explicit acknowledgment confirms that Tempus AI acquired and incorporated Plaintiffs' genetic sequences into its commercial database.

129. Tempus AI and Ambry engaged in this acquisition and the attendant illicit disclosure of genetic data ("Genetic Data Transfer") without providing notice or obtaining consent from any patients who received Ambry services.

---

[116] *Tempus Q1 2025 Overview*, TEMPUS AI, https://investors.tempus.com/static-files/4862cc66-8cdd-4877-99ab-1f09f4753d39 (last visited Mar. 25, 2026).

[117] Press Release, *Letter from Tom Schoenherr, CEO: Definitive Agreement for Acquisition of Ambry Genetics by Tempus AI*, TEMPUS AI (Nov. 4, 2024), https://www.ambrygen.com/company/press-release/152/letter-from-tom-schoenherr.

[118] Presentation, *Tempus AI, Inc. Investor Presentation Q4 2024,* TEMPUS AI, (Feb. 24, 2024), https://investors.tempus.com/static-files/7785f3fe-ccf4-4f86-935a-ad25a4d7f6e2.

[119] *Blog—Advancing the frontier of AI in healthcare,* TEMPUS AI (Oct. 9, 2025), https://www.tempus.com/resources/content/blog/advancing-the-frontier-of-ai-in-healthcare/.

130. Specifically, Tempus AI and Ambry failed to notify patients that their highly sensitive and valuable genetic information would be disclosed to Tempus AI for its own use, financial benefit, and further disclosure to third parties in the pharmaceutical industry for further use and profit.

**F. Industry Standards Call for Data Transfer Consent in Acquisition Deals**

131. Businesses, like Tempus AI, treat data as an asset. Indeed, *The Economist* has published articles explaining "[t]he world's most valuable resource is no longer oil, but data."[120]

132. Personal data is a unique corporate asset because, unlike other assets, the individuals to whom it pertains retain an ownership or property interest in it.

133. The law requires that companies dealing in medical or genetic data must comply with the requirements of statutes like HIPAA, GIPA, and the CMIA. Most recently, this issue was explored in connection with the bankruptcy of 23andMe Inc. ("23andMe").

134. One of 23andMe's most valuable assets was its enormous set of genetic data. The prospect of selling this asset as part of the bankruptcy proceedings raised serious privacy concerns and led to a Congressional hearing titled "Securing Americans' Genetic Information: Privacy and National Security Concerns Surrounding 23andMe's Bankruptcy Sale."[121]

135. During the 2025 Congressional hearing, representatives including Gary Palmer, questioned whether consumers "understood exactly what they were signing up for or who that data

---

[120] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[121] Margaret Hu, *Securing Americans' Genetic Information: Privacy and National Security Concerns Surrounding 23andMe's Bankruptcy Sale. Hearing before the House Committee on Oversight and Government Reform, United States House of Representatives, 119th Congress, First Session*, WILLIAM AND MARY LAW SCHOOL (June 10, 2025), https://scholarship.law.wm.edu/testimony/9/.

was being shared with" when it came to 23andMe.  For this reason, lawmakers called for 23andMe to inform consumers precisely what entities had access to their genetic information.[122]

136.    Since the 23andMe bankruptcy, more than 10 states have enacted statutes providing consumers with the right to request deletion of their genetic health information from companies. Other states have general data privacy regulations that require companies to provide notice and obtain consent before disclosing or transmitting personal information.

137.    Tempus AI, and by extension, Ambry Genetics are subject to these state statutes and, accordingly were required to provide notice, obtain consent, and allow an opportunity to request deletion before effectuating the Genetic Data Transfer.

### G.    Tempus AI and Ambry's Public Claims to Only Disclose De-Identified Genetic Information are False

138.    Both Tempus AI and Ambry Genetics claim to disclose only "de-identified" genetic information to third parties.[123]   These carefully drafted public statements, however, do not withstand scrutiny.

139.    For example, Ambry Genetics experienced a data breach in 2020, during which unauthorized actors stole 232,772 U.S. patients' PHI and PII.[124]  Ambry Genetics identified the patients whose information was stolen and subsequently notified its customers that the breach involved "[e]mails and attachments contain[ing] sensitive patient data such as names, diagnoses, and other medical information, with a subset of patients also having their Social Security numbers

---

[122] Press Release, *Wrap Up: Congress Taking Action to Ensure the Safety of Americans' Personal DNA Data*, COMMITTEE ON OVERSIGHT (June 10, 2025), https://oversight.house.gov/release/wrap-up-congress-taking-action-to-ensure-the-safety-of-americans-personal-dna-data/.
[123] Tempus AI, Inc., Prospectus Supplement (Aug. 27, 2025); *Notice of Privacy Practices,* AMBRY GENETICS (Mar. 19, 2025), https://www.ambrygen.com/legal/notice-of-privacy-practices.
[124] *See generally Notice of Ambry Genetics Data Breach Class Action Settlement*, AMBRYBREACHSETTLEMENT.COM, https://www.ambrybreachsettlement.com/ (last visited Mar. 25, 2026).

exposed."[125] This demonstrates that Ambry Genetics, maintains health information in identifiable form, not just because genetic information is inherently identifiable, but also because records are linked to patient PII.

140. Moreover, Tempus AI's acquisition Agreement explicitly contemplated the transfer of "Sensitive Data" to Tempus AI, with the Agreement defining "Personal Data" to include "biometric identifier or biometric information," and acknowledging that "[t]he disclosure or transfer of Sensitive Data to Buyer [Tempus AI] in connection with the transactions contemplated by this Agreement" was expected to occur.[126]

141. In addition, Tempus AI's public representations that the genetic data it discloses to third parties is "structured and de-identified, prior to commercialization" are at odds with its other statements.[127] For example, Tempus AI informs its licensing partners that its services enable them to "[i]dentify[] patients and contextualize[] where they are in the care journey relative to clinical guidelines"[128] and promotes its capacity to deliver "precision medicine to improve patient outcomes" through "unraveling disease complexity from a complete, unified picture of the patient"—all capabilities that would inherently necessitate the identification of individual patients.[129]

---

[125] Steve Adler, *Ambry Genetics Settles Class Action Data Breach Lawsuit for $12.25 Million*, HIPAA J. (Sep. 15, 2022), https://www.hipaajournal.com/ambry-genetics-settles-class-action-data-breach-lawsuit-for-12-25-million/.

[126] *Ex. 10.1, Securities Purchase Agreement*, Tempus AI, Inc. Current Report (Form 8-K) (Nov. 5, 2024).

[127] Tempus AI, Inc., Prospectus Supplement (Aug. 27, 2025) https://www.sec.gov/Archives/edgar/data/1717115/000119312525189854/d14762d424b7.htm.

[128] *Next Pathways*, TEMPUS AI, https://www.tempus.com/about-us/tempus-tech/ (last visited Mar. 25, 2026).

[129] Presentation, *Tempus AI, Inc. Investor Presentation Q4 2024,* TEMPUS AI (Feb. 24, 2024), https://investors.tempus.com/static-files/7785f3fe-ccf4-4f86-935a-ad25a4d7f6e2.

142.    Regardless of Ambry Genetics and Tempus AI's statements otherwise, genetic information cannot be de-identified because it contains biomarkers unique to each individual.[130] In other words, genetic information, such as DNA, is inherently identifiable. "DNA .... [is] considered unique to the individual data subject, and regardless of whether the labels are stripped away, they still contain identifying information."[131]  Indeed, "DNA is inherently unique to the individual .... Even without a name or phenotype linkage, DNA includes many clues for narrowing the identity possibilities—and it can be obtained from objects as ubiquitous as discarded coffee cups."[132]  According to the National Institute of Health and The Petrie-Flom Center at Harvard Law School, even purportedly "de-identified" genomic data can easily be "re-identified."[133]

### 1.    Relatedly, GIPA's Safe Harbor Provisions for De-Identified Information and "Limited Data Sets" Cannot Apply

143.    *First:* GIPA's Section 30(a) specifies that no person or company "may disclose or be compelled to disclose . . . the results of a genetic test ***in a manner that permits identification of the subject of the test***" (emphasis added).  This means that parties are prohibited from disclosing data, even if it is allegedly anonymized, if identification of the subject of the test would ever be possible.

---

[130] *See Policy Statement of the Federal Trade Commission on Biometric Information and Section 5 of the Federal Trade Commission Act*, FTC, https://www.ftc.gov/system/files/ftc_gov/pdf/p225402biometricpolicystatement.pdf (noting "[b]iometric information includes . . . genetics.") (last visited Mar. 25, 2026).

[131] *See* B. Malin and L. Sweeney, *Re-identification of DNA through an automated linkage process*, 2001 PROC AMIA SYMP. 423-427 (2001), https://pmc.ncbi.nlm.nih.gov/articles/PMC2243547/ (explaining that "seemingly anonymous DNA database entries can be related to publicly available health information to uniquely and specifically identify the persons who are the subjects of the information even though the DNA information contains no accompanying explicit identifiers such as name, address, or Social Security number and contains no additional fields of personal information").

[132] *Translation of Genomics for Patient Care and Research*, NAT'L ACADEMIES OF SCIS., ENG'G, & MED. (2015), https://www.nationalacademies.org/read/21707/chapter/4#21.

[133] Elizabeth Pike, *Privacy and Progress and the Deidentification of Whole Genome Sequence Data*, PETRIE-FLOM CTR. (May 10, 2013), https://petrieflom.law.harvard.edu/2013/05/10/privacy-and-progress-and-the-deidentification-of-whole-genome-sequence-data/.

48

144. This language cannot save Tempus AI from its wrongdoing because, as described herein, genetic information is *always* capable of being tied back to a specific person.[134]

145. Moreover, GIPA's Section 10 tells us that "de-identified information" is "health information that is not individually identifiable as described under HIPAA, as specified in 45 CFR 164.514(b)." HIPAA §164.514(b) indeed describes the limited conditions under which "[a] covered entity may determine that health information is not individually identifiable health information."

146. Neither of those two circumstances applies here.

(a) Under §164.514(b)(1) "[a] person with appropriate knowledge of and experience with generally accepted statistical and scientific principles and methods for rendering information not individually identifiable [must have] [a]pplyi[ed] such principles and methods, determine[d] that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information; and [] [d]ocument[ed] the methods and results of the analysis that justify such determination." On information and belief, Tempus AI has not performed this intensive analysis over Ambry patient data, since such a process has not been touted in either

---

[134] *See, also* Boris Lubarsky, *Re-Identification of "Anonymized" Data*, 1 GEO. L. TECH. REV. 202 (2017), https://georgetownlawtechreview.org/re-identification-of-anonymized-data/GLTR-04-2017/#:~:text=Data%20re%2Didentification%20occurs%20when,pseudonym%20reversal%2C%20or%20combing%20datasets ("Scrubbed data can be re-identified through three methods: insufficient de-identification, pseudonym reversal, or combing datasets. These techniques are not mutually exclusive; all three can be used in tandem to re-identify scrubbed data."); Mats G. Hansson, et al., *The risk of re-identification versus the need to identify individuals in rare disease research*, 2016 EUR. J. HUM. GENETICS 24(11):1553-1558 (2016), https://www.nature.com/articles/ejhg201652 (finding that "re-identification of individuals following the sharing of anonymised data is possible by using publicly available databases," there is strong incentive to do so because "maximum benefit from data may only be achieved by distinguishing individuals within the data set," and as of 2016 at least "two studies [have] succeeded in re-identification when the original data were de-identified in accordance with HIPAA standards").

49

Ambry's or Tempus AI's marketing materials, and multiple studies have shown that re-identification of health data sets is possible with publicly available information.

(b)     Under §164.514(b)(2) Tempus AI must "not have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." Genetic information, no matter how de-identified, can always be used alongside reference data to re-identify it, and Tempus AI, a leader in this field and owner of all of Ambry's reference data, would have actual knowledge of that fact. As proof, one need only look to the fact that Tempus AI informs third parties with whom it licenses that its services would allow them to "[i]dentify[] patients and contextualize[] where they are in the care journey relative to clinical guidelines."[135] Moreover, Tempus AI boasts of delivering "precision medicine to improve patient outcomes" by "unraveling disease complexity from a complete, unified picture of the patient"—which would necessarily require identifying a unique patient.[136]

147.    *Second:* GIPA's Section 31.7(a) further clarifies that: "[a] covered entity may, without a genetic information test subject's consent, create, use, and disclose ***a limited data set*** using information subject to this Act . . . and disclosure of such a limited data set must comply with the requirements set forth under HIPAA." Section 31.7(c) adds: "[t]he recipient of de-identified information shall not re-identify de-identified information using any public or private data source."

148.    Under Section 10, GIPA stipulates that "'[l]imited data set' has the meaning ascribed to it under HIPAA, as described in 45 CFR 164.514(e)(2)." Under HIPAA §164.514(e)(2), "[a] limited data set is protected health information that excludes" the enumerated

---

[135] *Next Pathways*, TEMPUS AI, https://www.tempus.com/about-us/tempus-tech/ (last visited Mar. 25, 2026).

[136] Presentation, *Tempus AI, Inc. Investor Presentation Q4 2024,* TEMPUS AI, (Feb. 24, 2024), https://investors.tempus.com/static-files/7785f3fe-ccf4-4f86-935a-ad25a4d7f6e2.

"direct identifiers of the individual" including "[b]iometric identifiers." HIPAA does not provide a comprehensive list of biometric identifiers, but the FTC has issued guidance on the subject: "[b]iometric information includes, but is not limited to, depictions, images, descriptions, or recordings of an individual's facial features, iris or retina, finger or handprints, voice, *genetics*, or characteristic movements or gestures (*e.g.*, gait or typing pattern)."[137]

149. As such, any data set that includes genetic information cannot, by definition, under HIPAA (and therefore GIPA), ever be considered a "limited data set" for the purposes of evading liability under Section 31.7(a).

## V. CLASS ALLEGATIONS

150. Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action under Rules 23(a), (b)(1), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, on behalf of the following class and Subclass (collectively, the "Classes"):

151. **Nationwide Class.** All United States residents whose personally identifying information or genetic testing information (including information derived from genetic testing) was transferred to Tempus AI in the Genetic Data Transfer.

152. **Illinois Subclass.** All Illinois residents whose personally identifying information or genetic testing information (including information derived from genetic testing) was transferred to Tempus AI in the Genetic Data Transfer.

153. **California Subclass.** All California residents whose personally identifying information or genetic testing information (including information derived from genetic testing) was transferred to Tempus AI in the Genetic Data Transfer.

---

[137] *Policy Statement of the Federal Trade Commission on Biometric Information and Section 5 of the Federal Trade Commission Act*, FTC, https://www.ftc.gov/system/files/ftc_gov/pdf/p225402biometricpolicystatement.pdf (last visited Mar. 25, 2026).

154. **New York Subclass.** All New York residents whose personally identifying information or genetic testing information (including information derived from genetic testing) was transferred to Tempus AI in the Genetic Data Transfer.

155. Excluded from the Classes are Tempus AI, Ambry Genetics, AstraZeneca, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns, and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case as defined in 28 USC § 455(b) and their immediate families.

156. <u>Numerosity</u>. Members of the proposed Classes are so numerous and geographically dispersed that joinder of all members is impracticable. Based on publicly available information, Ambry Genetics has conducted genetic testing on over 2.5 million individuals, at least 232,772 of whom resided in the United States as of 2020. Tempus AI has publicly stated that the acquisition expanded its oncology dataset to include "approximately 3 million genomic sequences from patients undergoing hereditary cancer testing"[138] and that "Ambry generates vast amounts of data across the ~400k patients it sequences each year."[139] Plaintiffs believe that tens of thousands, if not hundreds of thousands, of these individuals are Illinois, California, and New York residents or otherwise members of the proposed Classes. The exact number of Class Members is known only to Tempus AI, whose records identify each individual whose genetic information was transferred in the Ambry Genetics acquisition and subsequently disclosed to third parties. It is, therefore, impractical to join each member as a named Plaintiff. Further, the size and relatively modest value of the individual members' claims-ranging from $2,500 to $15,000 per violation under GIPA

---

[138] *Blog—Advancing the frontier of AI in healthcare,* TEMPUS AI (Oct. 9, 2025), https://www.tempus.com/resources/content/blog/advancing-the-frontier-of-ai-in-healthcare/.
[139] Presentation, f*43rd Annual J.P. Morgan Healthcare Conference*, TEMPUS AI (Jan. 13, 2025), https://investors.tempus.com/static-files/80e049bc-5dac-4b68-b699-984cd28763f2#:~:text=Page%2011,,%20immunology,%20etc. (quoted language appears on slide explaining how "[t]he addition of Ambry Genetics will extend our existing capabilities and reach").

render joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of the litigation. Moreover, the proposed Classes are readily ascertainable and identifiable from Tempus AI's records, including databases acquired from Ambry Genetics and records of data licensing agreements with third parties.

157. Typicality. Plaintiffs' claims are typical of the claims of members of the proposed Classes. Like all Class Members, Plaintiffs provided their genetic material to Ambry Genetics for hereditary testing. Like all Class Members, Plaintiffs never provided written authorization for Ambry Genetics to disclose their genetic information to Tempus AI, nor did they authorize Tempus AI to obtain, use, or further disclose their genetic information to third parties. Plaintiffs and members of the proposed Classes were harmed by the same uniform course of wrongful conduct by Tempus AI: (i) Tempus AI compelled Ambry Genetics to disclose their genetic testing and identifiable information derived from genetic testing as part of the acquisition, without obtaining express written consent as required by GIPA or the CMIA; and (ii) Tempus AI disclosed their genetic testing and identifiable information derived from genetic testing to third parties-including pharmaceutical companies such as AstraZeneca, GlaxoSmithKline, Bristol Myers Squibb, Pfizer, and others-without obtaining express written consent. Plaintiffs' claims arise from the same systematic GIPA, CMIA, and other statutory and common law violations affecting every member of the proposed Classes. Their claims are based on the same legal theories as the claims of other proposed Class Members. Plaintiffs do not assert any claims unique to themselves, and there are no defenses unique to Plaintiffs that would render their claims atypical.

158. Adequacy. Plaintiffs will fairly and adequately protect and represent the interests of the members of the proposed Classes. Plaintiffs' interests are coincident with, and not

53

antagonistic to, those of the members of the proposed Classes. Plaintiffs share the same interest as all Class Members in vindicating their statutory right to genetic privacy under GIPA, the CMIA, and other laws, and in obtaining redress for the unauthorized disclosure of their genetic information. Plaintiffs have no conflicts with other Class Members and are not subject to any unique defenses that would detract from their ability to represent the Classes. Plaintiffs have raised viable statutory claims of the type reasonably expected to be raised by members of the proposed Classes and will vigorously pursue those claims to ensure Defendant Tempus AI is held accountable for its systematic privacy violations. Plaintiffs are represented by counsel with substantial experience in the prosecution of complex class action litigation generally and in the emerging field of privacy and data breach litigation specifically. Plaintiffs' counsel have the resources, expertise, and commitment to prosecute this action vigorously on behalf of the Classes.

159. <u>Commonality</u>. Questions of law and fact common to the members of the proposed Classes predominate over questions that may affect only individual members of the Classes because Defendants have acted on grounds generally applicable to the Classes. The central questions in this case are whether Tempus AI violated GIPA, the CMIA, and other laws by compelling disclosure of and subsequently disclosing Class Members' genetic information without written authorization, whether AstraZeneca aided and abetted these violations, whether Plaintiffs were deceived, and whether Plaintiffs have a property right over their data that was violated. These questions do not depend on individualized proof. Tempus AI acquired Ambry Genetics' entire database of genetic information through a single transaction against privacy promises and legal disclosure obligations, and then subsequently made that data available to third parties through its data licensing business model. AstraZeneca knowingly aided and abetted this wrongful conduct. Every Class Member's genetic information was subject to the same unauthorized transfer and

disclosure. None were properly notified, given the opportunity to opt out, or compensated. Such generally applicable conduct lends itself to common proof. Questions of law and fact common to the Classes include:

(a)     whether Tempus AI compelled disclosure of Plaintiffs' and the Classes' genetic testing and information derived from genetic testing without written authorization;

(b)     whether Tempus AI disclosed Plaintiffs' and the Classes' genetic testing and information derived from genetic testing to third parties without written authorization;

(c)     whether Tempus AI's conduct violated GIPA;

(d)     whether Tempus AI properly informed Plaintiffs and members of the proposed Classes that it obtained their genetic testing and information derived from genetic testing;

(e)     whether Tempus AI obtained a written release (as defined in 410 ILCS 513/15) to obtain Plaintiffs' and the members of the proposed Classes' genetic testing and information derived from genetic testing;

(f)     whether Tempus AI's violations of GIPA were committed intentionally, recklessly, or negligently; and

(g)     whether Tempus AI's conduct violated the CMIA;

(h)     whether Tempus AI obtained a written release (as stipulated in Cal. Civ. Code § 56.11) to disclose Plaintiffs' and Class Members' private health information;

(i)     whether Tempus AI is a healthcare provider under Cal. Civ. Code § 56.06(a);

(j)     whether Plaintiffs and Class Members are "patients" under Cal. Civ. Code § 56.05(k);

55

(k)     whether Plaintiffs and Class Members were deceived and/or treated unfairly by Tempus AI;

(l)     whether AstraZeneca's conduct aided and abetted Tempus AI's wrongful conduct;

(m)     whether Plaintiffs and the proposed Classes are entitled to damages and/or other equitable relief.

160.    Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons—potentially numbering in the millions—to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. Given that GIPA provides statutory damages ranging from $2,500 to $15,000 per violation, individual Class Members have limited economic incentive to pursue their claims separately, despite the significant privacy harm they have suffered. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action. The prosecution of separate actions by individual members of the proposed Classes would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants. The prosecution of separate actions by individual members of the Classes would also create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests. Moreover, Tempus AI has acted or refused to act on grounds generally applicable to the proposed Classes, making injunctive and corresponding declaratory

relief appropriate with respect to the Classes as a whole. The claims of members of the proposed Classes consist of common issues, including whether Tempus AI compelled disclosure without authorization, whether Tempus AI disclosed genetic information to third parties without authorization, and whether such conduct violated GIPA, whose resolution in a class trial would materially advance this litigation. Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action. No significant individualized issues predominate; the central factual and legal questions involve Tempus AI's uniform course of conduct. Class-wide relief is essential to compliance with GIPA and to vindicate the privacy rights of the thousands of individuals whose genetic information was unlawfully transferred and disclosed.

161. <u>Injunctive relief appropriate</u>. Finally, injunctive relief is necessary to protect Plaintiffs and Class Members, making certification pursuant to Rule 23(b)(2) appropriate. Defendants have acted and continue to act on grounds generally applicable to the Classes, thereby making final injunctive and declaratory relief appropriate with respect to the Classes as a whole. Defendants' uniform practice of acquiring, using, and disclosing Plaintiffs' and Class Members' genetic information without notice or written authorization presents an ongoing and systemic violation of statutory and common law privacy rights that cannot be remedied through damages alone. Absent injunctive relief, Defendants will continue to retain, use, license, and further disclose this highly sensitive genetic information for commercial purposes. Declaratory relief is likewise warranted to establish that Defendants' conduct violates applicable law and to prevent future harm.

## VI. CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**VIOLATION OF THE**
**ILLINOIS GENETIC INFORMATION PRIVACY ACT ("GIPA")**

**410 ILCS 513/1, *et seq.***
**(On behalf of Plaintiffs, the Nationwide Class, and the Illinois Subclass against Tempus AI)**

162.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

163.    Tempus AI is a public corporation and thus qualifies as a "person" under GIPA. *See* 410 ILCS 513/10.

164.    Tempus AI is also a "health care provider" under GIPA. *See* 410 ILCS 513/10 (indicating the term "has the meaning ascribed to it under HIPAA, as specified in 45 CFR 160.103"). Under HIPAA, a health care provider is "a provider of services (as defined in section 1861 of the Act, 42 U.S.C. 1395x(u)),[140] a provider of medical or health services (as defined in section 1861(s) of the Act, 42 U.S.C. 1395x(s)),[141] and any other person or organization who furnishes, bills, or is paid for health care in the normal course of business. Tempus AI, through its subsidiary Ambry Genetics, furnishes and is paid for health care in the normal course of business. Moreover, Tempus AI provides medical and other health services as defined by the relevant statute, including diagnostic services and additional preventive services that identify medical conditions or risk factors.

165.    Tempus AI is also a "covered entity" under GIPA, which "has the meaning ascribed to it under HIPAA, as specified in 45 CFR 160.103." *See* 410 ILCS 513/10. Under 45 C.F.R. §

---

[140] "The term 'provider of services' means a hospital, critical access hospital, rural emergency hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, hospice program, or, for purposes of section 1395f(g) and section 1395n(e) of this title, a fund." 42 U.S.C. § 1395x(u).

[141] "The term 'medical and other health services' means any of the following items or services: (1) physicians' services; . . . [(2)](C) diagnostic services which are—(i) furnished to an individual as an outpatient by a hospital or by others under arrangements with them made by a hospital, and (ii) ordinarily furnished by such hospital (or by others under such arrangements) to its outpatients for the purpose of diagnostic study; . . . [and] (BB) additional preventive services." 42 U.S. Code § 1395x(s). "The term 'additional preventive services' means services . . . that identify medical conditions or risk factors and that the Secretary determines are— (A) reasonable and necessary for the prevention or early detection of an illness or disability." 42 USC § 1395x(ddd)(1).

58

160.103, a "covered entity" can refer to "[a] health care provider who transmits any health information in electronic form in connection with a transaction," like Tempus AI.

166. Section 15 of GIPA mandates that "genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized, in writing in accordance with Section 30, by that individual to receive the information." *See* 410 ILCS 513/15(a).

167. Section 30 of GIPA provides that "[n]o person may disclose or be compelled to disclose the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test, except to" (i) the subject of the test or the subject's legally authorized representative, (ii) any person designated in a specific written legally effective authorization for release of the test results and certain other persons not relevant here. *See* 410 ILCS 513/30.

168. And Section 35 of GIPA prohibits any "person to whom the results of a test have been disclosed [from disclosing] the test results to another person except as authorized under this Act." *See* 410 ILCS 513/35.

169. Tempus AI failed to comply with GIPA's mandates in Sections 15, 30, and 35 to keep Plaintiffs' and members of the proposed Classes' genetic tests, and information derived from those tests, confidential without express authorization. Tempus AI also failed to comply with GIPA's Section 30 prohibition against compelling the disclosure of genetic tests and information derived from those tests.

170. Plaintiffs and the members of the proposed Nationwide Class are individuals who provided genetic testing and information derived from genetic testing to Ambry Genetics. Illinois-headquartered Tempus AI, through its acquisition of Ambry Genetics, compelled disclosure and

obtained Plaintiffs' and members of the proposed Classes' genetic testing, and information derived from genetic testing, as explained in detail above. Defendant Tempus AI also violated GIPA by disclosing Plaintiffs' and members of the proposed Classes' identities and/or genetic testing and information to third parties. Defendant Tempus AI failed to obtain written authorization from Plaintiffs or members of the proposed Classes to obtain their genetic testing and information derived from genetic testing, as required by GIPA. This harmful conduct emanated from the state of Illinois, harming Ambry patients nationwide.

171. Tempus AI's violations of GIPA, as set forth herein, were knowing and willful, or were at least in reckless disregard of the statutory requirements. Alternatively, Tempus AI negligently failed to comply with GIPA.

172. On behalf of themselves and the Nationwide Class, Plaintiffs *seek*: (1) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and members of the proposed Classes by requiring Tempus AI to comply with GIPA's requirements; (2) statutory damages of $15,000 for each intentional and/or reckless violation of GIPA pursuant to 410 ILCS 513/40(a)(2) or, in the alternative, statutory damages of $2,500 for each negligent violation of GIPA pursuant to 410 ILCS 513/40(a)(1); and reasonable attorneys' fees and costs and other litigation expenses pursuant to 410 ILCS 513/40(a)(3).

### SECOND CAUSE OF ACTION
### VIOLATION OF THE
### CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT ("CMIA")
### Cal. Civil Code §§ 56, *et. seq.*
### (On behalf of Plaintiffs, the Nationwide Class, and the California Subclass against Tempus AI)

173. Plaintiffs incorporate by reference and reallege each and every allegation contained above as set forth in ¶¶ 1-161, as though fully set forth herein.

174. California Civil Code Section 56.101(a) requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

175. Tempus AI, through its California-based subsidiary Ambry Genetics, is a "provider" of healthcare because it is a "business organized for the purpose of maintaining medical information in order to make the information available to an individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of allowing the individual to manage the individual's information, or for the diagnosis and treatment of the individual." *See* Cal. Civ Code § 56.06(a).

176. Tempus AI failed to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information because it disclosed to third parties Plaintiffs' and Class Members' intimate health data without consent, including genetic information containing the results of their genetic testing or insights derived therefrom.

177. Tempus AI's failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was, at least, negligent and thus violates California Civil Code Sections 56.36(b) and 56.36(c).

178. Tempus AI is liable, nationwide, for violations of the CMIA in the amount of $1,000 per violation. *See id*. § 56.36(b)(1).

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")**
**Cal. Bus. & Prof. Code, §§ 17200, *et seq*.**
**(On behalf of Plaintiffs, the Nationwide Class, and the California Subclass against Tempus AI)**

179. Plaintiffs incorporate by reference and reallege each and every allegation contained above as set forth in ¶¶ 1-161, as though fully set forth herein.

180. The California Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

181. Tempus AI's material misstatements and omissions concerning their use of Plaintiffs' genetic data and their plan to transfer it harmed Plaintiffs and the Class.

182. Tempus AI' conduct, as alleged herein, violates the and the FAL. *See* Cal. Civ. Code §§ 1750, *et seq*; Cal. Bus. & Prof. Code §§ 17500, *et seq*.

183. Tempus AI' conduct is unfair because it violates public policy as stated in constitutional, statutory, and/or regulatory provisions, including, but not limited to, the FAL. *See* Cal. Bus. & Prof. Code §§ 17500, *et seq*.

184. Tempus AI had a duty to disclose their practices concerning the transfer and uses for Plaintiffs' genetic data.

185. Plaintiffs relied on Ambry Genetics' representations about data privacy and safety. Had Plaintiffs and Class Members known what they know today, they would not have used Ambry Genetics for their testing, would have opted out of their data being transferred to either Tempus AI or other third parties, or would have sought compensation for the commercial value of their genetic data.

186. As a result of Tempus AI' practices, Plaintiffs and Class Members have lost out on the money they may have received consistent with the commercial value of their genetic data.

187. Tempus AI will continue to cause harm through these material misrepresentations and omissions without legal action.

188. Plaintiffs and the California Subclass seek restitution, injunctive, and equitable relief, and any other relief the Court deems necessary and proper under the statute.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW § 349**

**(On behalf of Plaintiff Bianco, Plaintiff Bianco on Behalf of H.B., and the New York Subclass against Tempus AI)**

189.    Plaintiffs Bianco and H.B. ("Plaintiffs" for the purposes of this count) incorporate by reference all allegations in this Complaint as set forth in ¶¶ 1-161 and restate them as if fully set forth herein.

190.    New York General Business Law ("N.Y. Gen. Bus. Law") Section 349(a) declares that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state" are unlawful.

191.    Plaintiffs and the Class Members are "person[s]" within the meaning of N.Y. Gen. Bus. Law § 349(h).

192.    Defendant Tempus AI is a "person, firm, corporation or association" within the meaning of N.Y. Gen. Bus. Law § 349(b).

193.    Defendant Tempus AI is engaged in consumer-oriented conduct as described herein.

194.    Tempus AI violated state laws to deceptively acquire the most sensitive personal information a person can possess—their genetic information—against consumer expectations.

195.    This consumer-oriented conduct is misleading, in addition to deceptive, because neither Ambry Genetics' nor Defendant Tempus AI's Terms of Service nor any of its Privacy Policies discloses the acquisition of consumer genetic information in the manner alleged here, although *different* data sources and forms of data collection *are* disclosed.

196.    Plaintiffs and members of the Class had no way of discerning that Tempus AI's representations were false and misleading because members of the Class could not tell the future and were not privy to Tempus AI's plans to acquire Ambry Genetics.

197.    As a result of Tempus AI's conduct, Plaintiffs have suffered a privacy injury.

198. In other words, the conduct alleged herein constitutes "unlawful" deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349. As such, Plaintiffs and the Class seek monetary damages and the entry of preliminary and permanent injunctive relief against Tempus AI, enjoining it from transferring Plaintiffs' genetic data without proper notice and/or consent again. There is no adequate remedy at law. Defendant misleadingly, inaccurately, and deceptively acquired Plaintiffs' genetic data and is profiting from its possession.

199. Tempus AI had a duty to Plaintiffs and members of the Class to refrain from unfair and deceptive practices. Specifically, Tempus AI owed Plaintiffs and Class Members a duty to disclose to them, in the proper manner, that Tempus AI acquired Ambry Genetics and, with it, all of Ambry Genetics' consumer data. Tempus AI also had an obligation to seek consent for the acquisition of Plaintiffs' genetic information. Defendant took neither action.

200. Tempus AI thus violated N.Y. Gen. Bus. Law § 349 through its unfair and deceptive acts that harmed Plaintiffs. Defendant knows or should have known that its conduct violated N.Y. Gen. Bus. Law § 349.

201. Tempus AI's unlawful acts and practices complained of herein affect the public interest.

202. As a result of Tempus AI unlawful deceptive acts and practices, Plaintiffs and members of the Class are entitled to monetary, compensatory, treble, and punitive damages, injunctive relief, restitution, and disgorgement of all moneys obtained by means of Tempus AI's unlawful conduct, interest, attorneys' fees and costs, and an order enjoining Tempus AI's deceptive and unfair conduct, and all other just and appropriate relief available under the statute.

**FIFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Nationwide Class against All Defendants)**

203.    Plaintiffs incorporate by reference all allegations in this Complaint as set forth in ¶¶ 1-161 and restate them as if fully set forth herein.

204.    Plaintiffs bring this claim on behalf of themselves and the Class.

205.    Plaintiffs and the other members of the Class unwittingly conferred benefits on Tempus AI's by engaging the services of Ambry Genetics, whose data was later illicitly obtained by Tempus AI for Tempus AI's business purposes and commercial gain. Tempus AI paid $600 million to acquire the data assets containing Plaintiffs' and Class Members' genetic information, demonstrating the substantial commercial value of this data. Defendant then monetized these data assets by licensing them to pharmaceutical companies in agreements worth hundreds of millions of dollars, including a $200 million agreement with AstraZeneca and Pathos alone.

206.    Tempus AI received the benefits to the detriment of Plaintiffs and the other members of the Class because Plaintiffs and the other members of the Class paid money for the processing and secure handling of their private genetic and health information, but that information was not kept private. This is not what Plaintiffs bargained for and they have been robbed of the full benefit they should have received.

207.    Tempus AI has been unjustly enriched in obtaining and retaining the valuable genetic data derived from Plaintiffs' purchases of genetic tests and test-related services from Ambry Genetics. Tempus AI has reaped record revenues from this data-signing data agreements with over 70 pharmaceutical and biotechnology customers in 2025 alone and achieving "Record

65

Total Contract Value Exceeding $1.1 Billion"[142] while Plaintiffs and the Class have received nothing. For Tempus AI to retain these derivative benefits, including profits, under these circumstances would be unjust and inequitable given that such benefits were obtained against the strictures of state laws and based on deception of the consumer.

208. Similarly, AstraZeneca unlawfully acquired the genetic information of Plaintiffs and Class Members through its agreement with Tempus AI, which conferred many benefits upon AstraZeneca for commercial purposes.

209. AstraZeneca neither compensated nor offered to compensate Plaintiffs and Class Members for the information it obtained from Tempus AI. Plaintiffs and Class Members' information was thus used without consent, and for commercial gain to AstraZeneca, without providing them with compensation or benefit in return. AstraZeneca was unjustly enriched by obtaining Plaintiffs and Class Members' genetic information. Had AstraZeneca obtained this information lawfully and with consent, Plaintiffs and Class Members would have been compensated for it.

210. Because Tempus AI's and AstraZeneca's retention of the non-gratuitous benefits conferred on it by Plaintiffs and the other members of the putative classes is unjust and inequitable, Defendants must pay restitution to Plaintiffs and all members of the putative classes for unjust enrichment, as ordered by the Court.

---

[142]Press Release, *Tempus Achieves Record Total Contract Value Exceeding $1.1 Billion*, TEMPUS AI (Jan. 11, 2026), https://investors.tempus.com/news-releases/news-release-details/tempus-achieves-record-total-contract-value-exceeding-11-billion.

## SIXTH CAUSE OF ACTION
### FRAUDULENT CONCEALMENT
**(On behalf of Plaintiffs and the Nationwide Class against Tempus AI)**

211. Plaintiffs incorporate by reference all allegations in this Complaint as set forth in ¶¶ 1-161 and restate them as if fully set forth herein.

212. Although Tempus AI had knowledge that it was acquiring Ambry Genetics and had this knowledge for some time prior to the acquisition being final, it nevertheless concealed from Ambry Genetics' consumers both: (i) the fact of the impending acquisition; and (ii) the material implications of the acquisition, *i.e.*, that Defendant Tempus AI would receive Plaintiffs' genetic data and health data.

213. Tempus AI had a duty to disclose these facts and to seek Plaintiffs' consent in the manner required under state law.

214. Tempus AI' concealment misled Plaintiffs and the Class, resulting in privacy harm.

215. If Tempus AI had not fraudulently concealed its plans, Plaintiffs and the Class could have opted out of Tempus AI's acquisition of their genetic and health data and/or chosen to be compensated for their contributions to Tempus AI's monetization of their information.

216. Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, compensatory, actual, punitive, and treble damages, restitution, and attorneys' fees, filing fees, and costs.

## SEVENTH CAUSE OF ACTION
### ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
**815 Ill. Comp. Stat. §§ 510/2, *et seq*.**
**(On behalf of Plaintiff Barone and the Illinois Subclass against Tempus AI)**

217. Illinois Plaintiff Barone ("Plaintiff," for purposes of this Count) repeats and re-allege the factual allegations as set forth in ¶¶ 1-161, as if fully set forth herein.

218. Tempus AI is a "person" as defined by 815 Ill. Comp. Stat. § 510/1(5).

219. Tempus AI engaged in deceptive trade practices in the conduct of their business in violation of 815 Ill. Comp. Stat. § 510/2(a), including:

(a) Representing that goods or services have characteristics that they do not have;

(b) Representing that goods or services are of a particular standard, quality, or grade if they are of another;

(c) Advertising goods or services with intent not to sell them as advertised; and

(d) Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

220. Tempus AI's deceptive trade practices include:

(a) Failing to maintain Plaintiffs' and Class Members' medical and genetic information as confidential and secure despite explicit assurances that their data would be confidential;

(b) Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Illinois Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a) and HIPAA;

(c) Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs' and Illinois Subclass Members' Private Information;

(d) Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Illinois Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a);

68

(e)    Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff's and Illinois Subclass Members' Private Information; and

(f)    Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Illinois Subclass Members' genetic information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a).

221.    Tempus AI's representations and omissions were material because they were likely to deceive Plaintiff and Class Members about the safe retention and secure storing of Plaintiff's data and Defendant's ability to protect the confidentiality of consumers' Private Information.

222.    Tempus AI's above-described unfair and deceptive practices and acts were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Illinois Subclass Members that they could not reasonably avoid; this substantial injury outweighed any purported benefits to consumers or to competition.

223.    As a direct and proximate result of Tempus AI's unfair, unlawful, and deceptive trade practices, Plaintiff and Illinois Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Tempus AI, since they would not have paid Tempus AI for goods and services or would have paid less for such goods and services but for Tempus AI's violations alleged herein; and the loss of value of their genetic information, PHI, and PII.

224. Plaintiff and Illinois Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorney's fees.

**EIGHTH CAUSE OF ACTION**
**ILLINOIS PERSONAL INFORMATION PROTECTION ACT**
**815 Ill. Comp. Stat. §§ 530/10(A), *et seq*.**
**(On behalf of Plaintiff Barone and the Illinois Subclass against Tempus AI)**

225. Illinois Plaintiff Barone ("Plaintiff," for purposes of this Count) repeats and re-alleges the factual allegations above as set forth in ¶¶ 1-161 as if fully set forth herein.

226. As entities that handle, collect, disseminate, or otherwise deal with nonpublic personal information, Tempus AI is a "Data Collector" as defined by 815 Ill. Comp. Stat. § 530/5.

227. Plaintiff and Class Members' PII includes Personal Information as defined by 815 Ill. Comp. Stat. § 530/5.

228. As a Data Collector, Tempus AI was required to notify Plaintiffs and Class Members of the breach of the confidentiality or security of their data in the most expedient time possible and without unreasonable delay.

229. By failing to disclose the Genetic Data Transfer at all, let alone in the most expedient time possible, and without unreasonable delay, Tempus AI violated 815 Ill. Comp. Stat. § 530/10(a).

230. Tempus AI's decisions to fail to timely disclose the Genetic Data Transfer to Plaintiff and Class Members was knowing and willful.

231. Under 815 Ill. Comp. Stat. § 530/20, a violation of 815 Ill. Comp. Stat. § 530/10(a) constitutes an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act.

232. As a direct and proximate result of Tempus AI's violations of 815 Ill. Comp. Stat. § 530/10(a), Plaintiff and Class Members suffered damages, as described above.

70

233. Plaintiff and Illinois Subclass Members seek relief under 815 Ill. Comp. Stat. § 510/3 for the harm they suffered because of Tempus AI's willful violations of 815 Ill. Comp. Stat. § 530/10(a), including actual damages, equitable relief, costs, and attorneys' fees.

**NINTH CAUSE OF ACTION**
**AIDING AND ABETTING VIOLATIONS OF GIPA and the CMIA**
**(On behalf of Plaintiffs and the Nationwide Class, against AstraZeneca)**

234. Plaintiffs incorporate by reference and realleges each and every allegation contained above as set forth in ¶¶ 1-161, as though fully set forth herein.

235. Under Illinois law, a defendant may be held liable for aiding and abetting a tort when: (1) the party whom the defendant aids performs a wrongful act which causes an injury; (2) the defendant is regularly aware of his role as part of the overall tortious activity at the time that he provides the assistance; and (3) the defendant knowingly and substantially assists the principal violation.

236. Tempus AI performed wrongful acts that caused injury to Plaintiff Barone and members of the Illinois Subclass. Specifically, Tempus AI violated GIPA by compelling Ambry Genetics to disclose Plaintiffs' and members of the proposed Classes' genetic testing and information derived from genetic testing without written authorization, and by disclosing that genetic information to third parties, including AstraZeneca, without written authorization, as alleged herein.

237. AstraZeneca has openly acknowledged that it is not an AI company and must partner with AI companies to access their data capabilities. AstraZeneca has invested billions of dollars in AI partnerships to gain access to data assets, including collaborations with CSPC Pharmaceutical (up to $5.3 billion), Verge Genomics (more than $880 million), Absci ($247 million), and Algen Biotechnologies (up to $555 million). AstraZeneca's partnership with Tempus

71

AI fits within this strategy of using massive financial investments to acquire access to proprietary data sets containing sensitive patient information.

238. AstraZeneca's relationship with Tempus AI began in November 2021 with a multi-year strategic collaboration. From the outset, AstraZeneca was drawn to Tempus AI because of its data assets, described as "one of the world's largest libraries of clinical and molecular data." AstraZeneca's then-Executive Vice President of Oncology R&D stated that the collaboration would allow AstraZeneca to "enhance [its] data-driven R&D strategy" by analyzing "vast amounts of rich data using artificial intelligence." This initial collaboration established AstraZeneca as Tempus AI's "longest standing data customer" and demonstrated AstraZeneca's deep familiarity with Tempus AI's data practices.

239. By 2024, AstraZeneca's Chief Medical Officer and Oncology Chief Development Officer publicly appeared alongside Tempus AI executives to discuss their collaboration at the American Association for Cancer Research (AACR) 2024 conference. AstraZeneca's executive emphasized the company's focus on "genomics and the integration of multi-omic data sets" and stated that "AI and multimodal data are invaluable across the drug development journey." He acknowledged that AstraZeneca's partnership with Tempus AI had yielded "successes with real-world evidence data and organoid work, which wouldn't have been possible without this collaboration." This public endorsement demonstrates AstraZeneca's intimate knowledge of how Tempus AI was collecting, integrating, and monetizing patient data—including genomic data—for commercial purposes.

240. AstraZeneca was regularly aware of its role as part of the overall tortious activity at the time it provided assistance to Tempus AI. AstraZeneca is a sophisticated global pharmaceutical company that entered into what Tempus AI's CEO described as "probably the most

important deal I have ever personally worked on." The $200 million agreement was not a passive data purchase; rather, AstraZeneca made a "significant investment" in Tempus AI and agreed to cover "a significant amount of the compute costs necessary to train the model." AstraZeneca knew it was obtaining access to "over 300 petabytes of data, which includes rich molecular data connected to outcomes." As a major pharmaceutical company subject to its own data privacy and regulatory obligations, AstraZeneca knew or should have known that the genetic data it was receiving from Tempus AI, including data derived from the Ambry Genetics acquisition, had been obtained and was being disclosed without the written authorization of the individuals whose genetic information was contained therein.

241. AstraZeneca knowingly and substantially assisted Tempus AI's principal violations of GIPA. AstraZeneca's $200 million payment, combined with its "significant investment" in Tempus AI and its commitment to cover "a significant amount of the compute costs necessary to train the model," provided enormous financial incentive for Tempus AI to continue acquiring, retaining, and disclosing genetic information without proper authorization. Under the agreement, each party receives a copy of the foundation model-"AZ and Pathos to advance their drug discovery efforts and Tempus to advance [its] diagnostic and data products." This arrangement demonstrates that AstraZeneca was not merely licensing static data but was actively collaborating with Tempus AI to build AI models trained on genetic information obtained without consent. The non-exclusive nature of the agreement further incentivized Tempus AI's unlawful data practices, as Tempus AI remained "free to license its data and build other models with other biopharma companies," multiplying the commercial value of the improperly obtained genetic data. AstraZeneca's demand for and willingness to pay for access to this genetic data, its investment in

73

Tempus AI, and its active participation in building AI models using that data directly facilitated and encouraged Tempus AI's violations of GIPA.

242. AstraZeneca's investment in Tempus AI directly enabled and incentivized the Ambry Genetics acquisition and the subsequent transfer of patient genetic data. The Ambry Genetics acquisition closed on February 3, 2025—just two months before AstraZeneca executed the $200 million agreement. Tempus AI touted the acquisition as expanding its "oncology dataset to include approximately 3 million genomic sequences from patients undergoing hereditary cancer testing." AstraZeneca's massive investment provided Tempus AI with both the financial means and the commercial justification to acquire Ambry Genetics and incorporate its patients' genetic data into the data sets AstraZeneca was licensing.

243. The timing and structure of these transactions demonstrate that AstraZeneca's investments were designed to fuel Tempus AI's data acquisition strategy. Tempus AI's Q1 2025 financial results showed that its Data and Services business grew 43.2% year-over-year, with its data licensing business growing 58.0%, driven by revenue from agreements like the AstraZeneca deal. The symbiotic relationship between genomic testing and data licensing means that every dollar AstraZeneca invested in Tempus AI's data business directly incentivized Tempus AI to acquire more genetic data—including through the unauthorized acquisition of Ambry Genetics' patient data.

244. As a direct and proximate result of AstraZeneca's aiding and abetting of Tempus AI's GIPA violations, Plaintiffs and members of the Illinois Subclass have suffered damages, including the unlawful disclosure of their highly sensitive genetic information.

245. Plaintiffs and the Illinois Subclass seek all monetary and non-monetary relief allowed by law, including actual damages, equitable relief, costs, and attorneys' fees.

74

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Barone, Plaintiff Rukhin, Plaintiff Bianco, and Plaintiff Bianco on behalf of her minor child H.B., on behalf of themselves and the proposed Classes, respectfully requests that this Court enter an Order:

A. Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiff Barone, Plaintiff Rukhin, Plaintiff Bianco, and Plaintiff Bianco on behalf of her minor child Plaintiff H.B. as a representative of the Classes, and appointing their counsel as Class Counsel;

B. Declaring that Defendant's actions, as set out above, violate GIPA, 410 ILCS 513/1, *et seq.*;

C. Awarding statutory damages of $15,000.00 for each and every intentional and/or reckless violation of GIPA pursuant to 410 ILCS 513(40)(a)(2), or alternatively, statutory damages of $2,500.00 for each and every violation pursuant to 410 ILCS 513(40)(a)(1) if the Court finds that Defendant's violations were negligent;

D. Awarding injunctive and other equitable relief as is necessary pursuant to 410 ILCS 513(40)(a)(4) to protect the interests of the Classes;

E. Awarding Plaintiff Barone, Plaintiff Rukhin, Plaintiff Bianco, and Plaintiff Bianco on behalf of her minor child Plaintiff H.B. and the Classes their reasonable attorneys' fees and costs and other litigation expenses, pursuant to 410 ILCS 513/40(a)(3);

F. Awarding all monetary and non-monetary relief allowed by law for each and every violation of the California UCL pursuant to Cal. Bus. & Prof. Code, §§ 17200, *et seq*, including restitution of all profits stemming from Tempus AI's unfair, unlawful, and fraudulent business practices or use of their Personal Information;

75

declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief;

G. Awarding monetary and non-monetary relief allowed by law for each and every violation of N.Y. Gen. Bus. Law § 349, including actual damages or statutory damages of $50 (whichever is greater), treble damages, restitution, injunctive relief, and attorney's fees and costs;

H. Awarding restitution and disgorgement of all profits, benefits, and other compensation unjustly obtained by Tempus AI through its wrongful conduct.

I. Awarding actual damages, compensatory damages, punitive damages, treble damages, restitution, injunctive and equitable relief, and attorney's fees, filing fees, and costs to Plaintiffs and the Classes for Fraudulent Concealment;

J. Awarding injunctive relief and reasonable attorney's fees to Plaintiff Barone and the Illinois Subclass for violations of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. §§ 510/2, *et seq*;

K. Awarding actual damages, equitable relief, costs, and attorney's fees to Plaintiff Barone and the Illinois Subclass for Tempus AI's willful violations of the Illinois Personal Information Protection Act, 815 Ill. Comp. Stat. §§ 530/10(A), *et seq*;

L. Awarding actual damages, equitable relief, costs and expenses in this litigation, expert fees, and attorney's fees against AstraZeneca to Plaintiff Barone and the Illinois subclass for aiding and abetting Tempus AI's violations of GIPA, the CMIA, and other laws;

M. Awarding Plaintiffs and the Classes pre- and post-judgment interest, to the extent allowable; and

N.      Awarding such other and further relief as equity and justice may require.

## VIII.  JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury for all issues so triable.

Dated: March 30, 2026                    Respectfully submitted,

**DICELLO LEVITT LLP**

By: */s/ Amy Keller*
Amy Keller
Rebecca Trickey
10 North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
Telephone: 312.214.7900
akeller@dicellolevitt.com
rtrickey@dicellolevitt.com

**LABATON KELLER SUCHAROW LLP**
Michael P. Canty (*pro hac vice forthcoming*)
Carol C. Villegas *(pro hac vice forthcoming)*
Danielle Izzo *(pro hac vice forthcoming)*
Gloria J. Medina *(pro hac vice forthcoming)*

140 Broadway
New York, New York 10005
Telephone:  212.907.0700
Facsimile:  212.818.0477
mcanty@labaton.com
cvillegas@labaton.com
dimazzeo@labaton.com
gmedina@labaton.com

*Counsel for Plaintiffs and the Putative Classes*